UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PHILLIP MAYS,

Plaintiff,

v.

CAROLYN W. COLVIN,

Defendant.

Case No. 15-cv-02731-MEJ

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 17, 29

## INTRODUCTION

Plaintiff Phillip Mays ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a final decision of Defendant Carolyn W. Colvin ("Defendant"), the Acting Commissioner of Social Security, denying Plaintiff's claim for disability benefits.  Pending before the Court are the parties' cross-motions for summary judgment.  Dkt. Nos. 17, 29.  Pursuant to Civil Local Rule 16-5, the motions have been submitted on the papers without oral argument.  Having carefully reviewed the parties' positions, the Administrative Record ("AR"), and relevant legal authority, the Court hereby **DENIES** Plaintiff's Motion and **GRANTS** the Commissioner's Cross-Motion for the reasons set forth below.

## BACKGROUND

Plaintiff was born on July 16, 1975.  AR 104.  He attended Castlemont Community High School from 1989 to 1993, where he received grades ranging from A to F.  AR 171-72.  The record indicates Plaintiff attended classes through the spring semester of his twelfth grade year, but he did not graduate or get a GED.  AR 171, 266, 322, 353.  Although Plaintiff reported he attended special education classes for "slow learners" (AR 219, 322, 353), the transcript in the Administrative Record reflects that he was also enrolled in college preparatory classes, including

United States District Court
Northern District of California

United States District Court
Northern District of California

1    World Culture, Algebra, U.S. History, English, and Economics.  AR 171.  Plaintiff has previous

2    work experience as a security guard and warehouse worker.  AR 145.

3         Plaintiff reported that his father was violent and abused him as a child, and that he

4    witnessed abuse between his parents.  AR 255, 266.  He also reported that he sustained an injury

5    to his skull in a fight around 2005 (AR 219), he was stabbed about 20 times in various locations,

6    including his head and right hand (AR 266), and was stabbed in the head 20 times by a jealous

7    girlfriend (AR 353).[1]  Plaintiff frequently reported being homeless or staying with family or

8    friends.  AR 266, 322, 326, 341, 346, 354, 361, 369.  He was incarcerated at Alameda County Jail

9    between May 12, 2010 and October 24, 2011 (AR 173-86, 251-61), and at Santa Rita Jail between

10   February 5, 2013 and May 21, 2013 (AR 355-67).

11        On May 12, 2010, Plaintiff was initially screened for treatment at the Alameda County

12   Behavioral Health Care Services, Criminal Justice Mental Health Program (Alameda County

13   Behavioral Health).  AR 186, 213.  At his initial screening, Plaintiff reported hearing voices,

14   having depression, paranoia, and violent moods, and difficulties with impulse control.  AR 184,

15   186, 212-13.  He denied suicidal or homicidal ideation, or planning a suicide attempt.  AR 186,

16   213.  On evaluation, F. Rosenthal, M.D., noted that Plaintiff is "not always consistent in his

17   complaints" and "tends to change focus – [be] evasive," and that Plaintiff "decided depression

18   more of an issue [yet] refuses antidepressant medication."  AR 184, 212.  Dr. Rosenthal also noted

19   that Plaintiff "is pressured [sic], obsessive, and delusional, has paranoid concerns c/o AH's and

20   depression", and "tends to be rambling, poorly organized – and somewhat challenging."  *Id*.

21        On May 19, 2010, Plaintiff visited Alameda County Behavioral Health and reported that he

22   had never received psychiatric treatment in the past, that he was not suicidal, and denied

23   attempting suicide in the past.  AR 183, 210.  The clinician at Alameda County Behavioral Health

24   reported that on mental status examination, Plaintiff was evasive and reported hearing a male

25   voice tell him to harm others; the clinician referred Plaintiff to a medical doctor for a medication

26

27   _____

[1] It is not clear whether these are the same or separate incidents.

28                                                    2

evaluation.  *Id.*

On June 11, 2010, Plaintiff went to Alameda County Behavioral Health and requested medication to treat his auditory hallucination; Dr. Rosenthal reported that Plaintiff appeared to be "somewhat drug seeking and tends to be somewhat vague when asked about details."  AR 181, 207.

On June 15, 2010, Sarah Ulloa, MFTI at Alameda County Behavioral Health, reported that on mental status examination, Plaintiff was well-groomed, anxious, had good eye contact, was clear and coherent, and walked on crutches due to his leg being broken in two places; Plaintiff reported that medications were "helpful" and that he had problems sleeping.  AR 180, 206.  On July 14, 2010, Ms. Ulloa reported that on mental status examination, Plaintiff had good eye contact and clear and coherent speech, was cooperative, well-groomed, talkative, and "doing well" on psychiatric medication, and his mood was "good."  AR 178, 203.

On September 10, 2010, Dr. Rosenthal reported that Plaintiff "seems [to be] in [a] fairly good mood," and that he was not taking Risperdal but had continued with the medication Paxil and was "apparently not troubled by AH [auditory hallucinations] at this time – and may not have a psychotic disorder – [he] feels he does well just w[ith] Paxil and [his] mood is controlled."  AR 202.

On October 6, 2010, Plaintiff complained of continued insomnia and decreasing appetite to a clinician at Alameda County Behavioral Health.  AR 200.  He presented as "unsure of AH[,] as he first answered that he continues to have AH but less than originally reported" and then "he said he did not have AH at all."  *Id.*  Plaintiff's appearance was within normal limits; he was in a wheelchair but was able to step over to the office chair without difficulty.  *Id.*  He was calm and cooperative, and there was no evidence of psychosis or distress.  *Id.*  Plaintiff denied having any suicidal and homicidal ideation.  *Id.*

Also on October 6, 2010, Dr. Rosenthal noted that Plaintiff reported "doing well on current med[ications]" without side effects, and that Plaintiff had a good mood, was calm and appropriate, and had been taking Risperdal and agreed to continue taking his medication.  AR 199.  Dr.

1    Rosenthal completed a Treatment Continuity Plan for Plaintiff's anticipated jail release date of

2    October 28, 2010 for Plaintiff to continue taking the medication Paxil and contact mental agencies

3    on a list to continue treatment.  AR 195.  He continued Plaintiff's Paxil prescription.  AR 201.  On

4    October 15, 2010, Dr. Rosenthal reported that Plaintiff was not compliant with his prescribed

5    medication treatment and that his prescription was extended.  AR 196, 260.

6            On October 21, 2010, Peter Slaubaugh, M.D., at Alameda County Medical Center

7    Highland Outpatient reported that Plaintiff had decreased flexion in the right knee but had an

8    overall normal examination of the knee.  AR 188.

9            On November 9, 2010, licensed psychologist Patricia Spivey, Psy.D., examined Plaintiff.

10   AR 219-22.  Dr. Spivey reported that Plaintiff had taken public transportation to the appointment

11   and that he could shower, dress, and feed himself.  AR 220.  On mental status examination, Dr.

12   Spivey reported Plaintiff was oriented to person, place, time, and purpose, his thought processes

13   and content included evidence of poor reality testing, Plaintiff did not respond to internal stimuli

14   or any loose associations, and Plaintiff presented a flat affect and had fair mood, good attention,

15   and poor insight and judgment.  *Id*.  Dr. Spivey reported Plaintiff had a full scale IQ score of 79,

16   which was consistent with his presentation and history of being in special education, Plaintiff

17   performed fairly well on the memory subtests, and Bender drawing tests revealed no severe

18   deficits.  AR 219, 221.  Dr. Spivey opined that Plaintiff had no impairment in his abilities to

19   follow simple and complex instructions and communicate effectively in writing.  AR 221.  Dr.

20   Spivey commented that Plaintiff had mild impairment in his abilities to maintain adequate pace or

21   persistence to complete 1-2 step simple repetitive tasks or to maintain adequate pace or persistence

22   to complete complex tasks, maintain adequate attention or concentration, and verbally

23   communicate effectively with others.  *Id*.  Dr. Spivey also stated that Plaintiff had moderate

24   impairment in his abilities to adapt to changes in job routine and withstand the stress of a routine

25   workday, and moderate to marked impairment in his abilities to maintain emotional stability or

26   predictability and interact appropriately with coworkers, supervisors, and the public on a daily

27   basis.  *Id*.

28

United States District Court
Northern District of California

On November 17, 2010, State agency reviewing psychiatrist D. Lucila, M.D., reviewed the record evidence and found that Plaintiff had an affective disorder and a personality disorder (AR 223) that caused mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, concentration, persistence, or pace (AR 231). Dr. Lucila also found that there was insufficient evidence of any repeated episodes of decompensation. AR 231. Also on November 17, Dr. Lucila completed a Mental Residual Functional Capacity Assessment form. AR 234-35. On this form, Dr. Lucila opined that Plaintiff was moderately limited in his abilities to understand, remember, and carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically-based symptoms, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. *Id.* Dr. Lucila stated that otherwise, Plaintiff was not significantly limited in most areas of mental functioning, including in the abilities to understand, remember, and carry out very short instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, and respond appropriately to changes in the work setting. *Id.*

On July 21, 2011, L. Crumpler, M.D., at LifeLong Medical Care, reported that Plaintiff was cooperative and pleasant, was alert and oriented times three, and had an antalgic gait. AR 257-58. Dr. Crumpler ordered x-rays after Plaintiff's complaints of leg pain, reported that Plaintiff's asthma was controlled and that Plaintiff was given an inhaler, and stated that Plaintiff would start Paxil for his depression. AR 258. Plaintiff denied having any current suicidal or homicidal ideation, reported sleeping too much, and reported that his appetite was okay. AR 257.

On August 25, 2011, Plaintiff's clinician at Alameda County Behavioral Health noted that his last dose of Paxil was on July 20, 2011. AR 255. The clinician reported that on mental status examination, Plaintiff was cooperative, had behavior, orientation, thought content, and thought processes within normal limits, and had depressed and dysthymic mood, flat affect, fair insight,

1    fair impulse control, fair judgment, and no hallucinations.  AR 255-56.

2         On August 29, 2011, a doctor at Alameda County Behavioral Health reported that Plaintiff

3    was "clear" and cooperative, had no observed abnormal movements, had speech within normal

4    limits, and found the change in medication to Remeron "helpful" and asked for medication "to

5    control his anxiety."  AR 254.

6         On October 28, 2011, Dr. Crumpler saw Plaintiff for his asthma, mental health, and sores

7    on his penis.  AR 335.  Dr. Crumpler assessed Plaintiff's asthma as mild and intermittent, found

8    Plaintiff's depression controlled by his taking Remeron and Buspar, and found that the sores had

9    healed.  *Id*.

10        On November 7, 2011, registered psychological assistant Katherine Wiebe, Ph.D.,

11   examined Plaintiff upon referral by the Homeless Action Center.  AR 265-80.  Dr. Wiebe reported

12   that Plaintiff was well-groomed and casually dressed, had an anhedonic mood, was mildly

13   dysphoric, was generally dissociated, had normal affect, was cooperative during the interview, had

14   normally flowing thoughts, appeared to have "slow[]" thinking with delayed responses, had vague

15   speech, expressed suicidal ideation without intent, denied current auditory or visual hallucinations

16   while stating he had them "in the past," and was oriented to person, place, and time.  AR 268.  She

17   also noted that Plaintiff did not have a cane with him though he usually did.  AR 267.

18        Dr. Wiebe found that Plaintiff had severe impairment in memory, visual and spatial fields,

19   executive areas, and attention, concentration, and persistence, as well as moderate sensory, motor,

20   and language impairments, and mildly to moderately impaired intellectual functioning.  AR 276.

21   She also stated that Plaintiff's symptoms made him unlikely to be able to complete tasks assigned

22   to him in a work setting; he was easily fatigued; he required reminders to accomplish tasks; had

23   difficulty leaving his home due to paranoia, anxiety, and depression; was limited in his ability to

24   manage daily tasks and affairs; and had trouble with interpersonal relationships because of his

25   personality disorder symptoms.  *Id*.  Dr. Wiebe diagnosed Plaintiff with major depressive disorder

26   – recurrent, chronic, severe, and with psychotic features.  *Id*.  She reported that Plaintiff was in the

27   <0.1 to 4 percentile for the RBANS tests.  AR 278.  Dr. Wiebe opined that Plaintiff had mild

28

United States District Court
Northern District of California

6

impairment in intellectual functioning, minimal impairment in orientation, moderate impairment in language and motor and praxis skills, severe impairment in attention and concentration, short-term memory, long-term memory, visual and spatial organization, judgment and insight, executive functioning, and social functioning, marked impairment in the ability to understand, remember, and carry out very short and simple instructions, get along and work with others, and accept instructions and respond appropriately to criticism from supervisors, and extreme limitation in the rest of the abilities, including the ability to maintain attention and concentration for two hour segments, perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, respond appropriately to changes in a routine work setting and deal with normal work stressors, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and maintain regular attendance and be punctual within customary, usually strict tolerances.  AR 279-80.

On December 14, 2011, William Spivey, Ph.D., filled out a Mental Impairment Questionnaire.  AR 283-87.  Dr. Spivey indicated that Plaintiff had mild impairments in understanding and remembering very short and simple instructions, making simple work-related decisions, asking simple questions or requesting assistance, maintaining socially appropriate behavior, and adhering to basic standards of neatness and cleanliness, and moderate impairment in carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, accepting instructions and responding appropriately to criticism from supervisors, being aware of normal hazards and taking appropriate precautions, interacting appropriately with the general public, traveling in unfamiliar places, and using public transportation.  AR 285-86.  He also indicated that Plaintiff otherwise had marked or extreme limitations in the rest of the mental abilities and aptitudes needed to do unskilled, semiskilled, and skilled work, and to do particular jobs.  *Id*.  Such abilities and aptitudes include remembering work-like procedures, maintaining attention for two hour segments, maintaining regular attendance and being punctual within customary, usually strict tolerances, working in coordination with or in proximity to others without being unduly distracted, and completing a normal workday and workweek without

1    interruptions from psychologically-based symptoms.  *Id.*  They also include performing at a

2    consistent pace without an unreasonable number of and lengths of rest periods, getting along with

3    coworkers or peers without unduly distracting them or exhibiting behavioral extremes, responding

4    appropriately to changes in a routine work setting, and dealing with normal work stress.  *Id.*  Dr.

5    Spivey opined that Plaintiff had marked restriction of activities of daily living, difficulties in

6    maintaining social functioning, deficiencies in concentration, persistence, or pace, and three

7    repeated episodes of decompensation within a twelve-month period, each of at least two weeks

8    duration.  AR 286.

9         On March 20, 2012, Board certified internist Jenna Brimmer, M.D., conducted a

10   consultative internal medicine examination, as Plaintiff complained of a leg injury.  AR 291-95.

11   Dr. Brimmer reported that Plaintiff suffered a right leg fracture around late 2010 when he fell off a

12   second story balcony and subsequently underwent surgery with hardware placed.  AR 291.  Dr.

13   Brimmer reported that Plaintiff was pleasant and cooperative, spoke in full sentences and used

14   hand gestures while talking, and was casually dressed with adequate grooming and hygiene.  AR

15   292.  Plaintiff reported to Dr. Brimmer that he could dress himself but needed help with putting on

16   his pants and washing his feet due to his leg pain, he could heat food in the microwave, do dishes,

17   and vacuum, and that he fed birds during the day as a hobby.  AR 291-92.  Dr. Brimmer reported

18   that Plaintiff came with a cane and walked with a limp, but that he had no difficulty moving about

19   the exam room, getting onto the exam table, manipulating his clothing and personal items, opening

20   the door, and writing his name independently.  AR 292.

21        Dr. Brimmer reported that on physical examination, Plaintiff had full 5/5 strength in the

22   lower extremities, had no evidence of muscle atrophy, was able to stand on his tiptoes and heels,

23   and could walk heel-to-toe in a straight line.  AR 293-94.  She opined Plaintiff could stand or walk

24   for six hours in an eight-hour workday, could sit without limitation, could walk with a cane, could

25   lift up to 50 pounds occasionally and 25 pounds frequently, could occasionally take part in

26   climbing, balancing, stooping, kneeling, crouching, and crawling, could perform manipulative

27   activities without limitation, and could perform workplace environmental activities without

28                                                                                        8

United States District Court
Northern District of California

limitation.  AR 294-95.

On April 19, 2012, State agency reviewing physician L. Pancho, M.D., reviewed the medical evidence in the record.  AR 301-02.  Dr. Pancho opined that Plaintiff was able to lift and carry 50 pounds occasionally and 25 pounds frequently, stand or walk for a total of about six hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday.  *Id.*  Dr. Pancho also determined that Plaintiff was unlimited in pushing or pulling, and could occasionally climb ramps and ladders, balance, stoop, kneel, crouch, and crawl.  *Id.*

On June 7, 2012, Plaintiff completed an Adult Medical History form for LifeLong Medical Care.  AR 330-33.  On the form, he indicated that he had a history of asthma, that he took the medications Remeron and Burspuren [sic] and used an asthma pump, and that he had a history of problems involving dizziness, forgetfulness, headaches, sinus problems, tooth pain, pain or loss of strength or feeling in the hips and legs and knees, depression, and biting his skin.  AR 330-31.  Plaintiff indicated that he did not feel threatened by anyone, that he felt safe in his home, and that he had a gun and smoke detector in his home.  AR 332.

On July 5, 2012, a medical provider at LifeLong Medical Care continued Plaintiff on Ibuprofen, asthma inhaler treatment, and Remeron and Buspar treatment for his leg pain, asthma, and depression.  AR 324, 326.

On July 26, 2012, Rene Thomas, M.D., conducted a psychiatric evaluation.  AR 322-23.  Plaintiff denied, to Dr. Thomas, having any prior psychiatric treatment or hospitalizations prior to his being in Santa Rita Jail starting in 2010.  AR 322-23.  Plaintiff reported to Dr. Thomas that the antidepressant Remeron had been effective in controlling his depressive symptoms and helped him sleep better, but the symptoms returned when he had not taken Remeron in three months.  *Id.*

On mental status examination, Dr. Thomas noted that Plaintiff was alert, neatly dressed, calm, and appropriate, and had a normal speech rate and rhythm.  AR 323.  Dr. Thomas also stated that Plaintiff had a depressed mood, had a positive affect within the normal range, did not appear depressed, had logical and coherent thought processes, had no suicidal or homicidal ideation, had no auditory or visual hallucination, did not exhibit any evidence of delusions or paranoid ideation,

and appeared to have normal cognition.  *Id.*  Dr. Thomas diagnosed Plaintiff with a recurrent major depressive disorder, as borderline intellectual functioning by history, and as taking part in marijuana use.  AR 323.  Dr. Thomas recommended that Plaintiff restart Remeron and another medication, Buspar, for Plaintiff's nail biting, and that Plaintiff follow up in one month.  *Id.*  Dr. Thomas continued Plaintiff on asthma inhaler treatment.  AR 321.

Between August 30, 2012 and January 14, 2013, Plaintiff periodically received treatment from Health Care for the Homeless via the TRUST Clinic.  AR 339-46.  On August 30, 2012, he reported to Nurse Practitioner Laurel Barber that he was currently taking the medications Remeron and Risperdal, that Remeron was the only reason he could sleep, that he took Risperdal to make the voices go away, and that his last auditory hallucination was about a year prior.  AR 345.  Ms. Barber reported that on mental status examination, Plaintiff was casually dressed, had poor eye contact, was "very cooperative," had slow and soft speech, described his mood as depressed and affect as sad, had linear and logical thought process, denied auditory and visual hallucination, denied paranoia and delusions, was fully alert and oriented, and had fair insight and poor judgment.  AR 346.

On September 6, 2012, Dr. Thomas at Lifelong Medical Care reported that Plaintiff was alert, calm, engageable, neatly dressed, and exhibited a flat affect.  AR 320.  Plaintiff reported sleeping well on Remeron but had a poor appetite.  *Id.*  He reported having no side effects from taking Remeron and Buspar, denied having any suicidal ideation, homicidal ideation, or feelings of hopelessness, and complained of being irritable with his brother for "little things."  *Id.*  Dr. Thomas assessed Plaintiff as having a recurrent major depressive disorder, with no improvement yet.  *Id.*  Dr. Thomas increased Plaintiff's prescriptions for Remeron and Buspar, and discussed counseling referrals with Plaintiff.  *Id.*

On September 24, 2012, Adisa Wilmer, M.D., at Lifelong Medical Care, reported that Plaintiff had right leg pain and strain, reduced strength in his right hamstring, and that his asthma and depression were stable.  AR 318.

On September 26, 2012, Plaintiff received treatment at LifeLong Medical Care for his

complaints of leg pain and a cold.  AR 316.  Plaintiff continued using an asthma inhaler.  AR 374.

On October 22, 2012, Plaintiff visited LifeLong Medical Care, complaining of leg pain and requesting an asthma pump; also, the doctor, Dr. Wilmer, reported that Plaintiff's depression was "stable."  AR 315.  Dr. Wilmer referred Plaintiff for x-rays of his right knee.  AR 317.

On October 31, 2012, Plaintiff saw Michael Boroff, M.D., at the TRUST Clinic and complained of leg pain, anger issues, depression, problems sleeping, auditory hallucinations, fainting spells, and frequent biting of his fingers.  AR 343.  Dr. Boroff reported that on mental status examination, Plaintiff was cooperative and engaged, struggled to articulate his symptoms and was often vague when questioned.  AR 343.  Dr. Boroff also stated that Plaintiff denied having any suicidal ideation but self-reported having a severely depressed mood and frequent auditory hallucinations, though he did not appear to be attending to them in the session.  *Id.* Plaintiff also self-reported having feelings of significant paranoia, denied and gave no obvious indications of mania or depersonalization, had apparently impaired memory and focus, and had estimated below-average intelligence.  AR 343-44.

On December 13, 2012, Plaintiff saw Dr. Boroff again and reported experiencing leg pain that kept him from standing or walking for long periods of time.  AR 341.  Plaintiff also told Dr. Boroff that he was relying on others to help him keep track of things in his life, about his history of being in special education, about dropping out of school to support his wife, and that he had a poor memory, problems focusing, and difficulties with reading comprehension.  *Id.*

On December 27, 2012, Plaintiff reported to Dr. Boroff that his mood was "down" due to his being out of medication, and that "When on medication, he feels much better," although "even with medication, he has to avoid people, as they trigger his anger."  AR 340.  Plaintiff gave vague answers about his psychotic symptoms but denied hearing voices, although he reported that he talks to himself.  *Id.*

On January 14, 2013, Plaintiff saw Dr. Boroff while in distress, as he was hearing voices again and was out of medication.  AR 339.

Dr. Boroff conducted a psychological evaluation based on meetings with Plaintiff on

11

August 30, 2012, October 31, 2012, December 13, 2012, December 27, 2012, and January 14, 2013. AR 353-54. In his psychological evaluation, Dr. Boroff reported that Plaintiff struggled to make it to his appointments and gave vague answers to questions posed to him, but on mental status examination, Plaintiff was oriented times four, and was cooperative and engaged. AR 354. Dr. Boroff stated that Plaintiff self-reported that his mood was depressed, but his affect was not mood-congruent, and that Plaintiff smiled at inappropriate times. *Id*. Dr. Boroff also noted that Plaintiff denied having any suicidal or homicidal ideation, though he reported hearing voices that commanded him to hurt himself, and self-reported having intense feelings of paranoia, although neither paranoia nor auditory hallucinations were apparent in sessions. *Id*. The doctor also mentioned Plaintiff's coherent speech, and that Plaintiff denied experiencing and did not display obvious signs of mania or depersonalization, and had limited insight, had severely impaired judgment, demonstrated clear deficits in memory and focus, and had estimated below-average intelligence. *Id*.

On February 5, 2013, intern Sarah Ulloa at Alameda County Behavioral Health Care Services reported that Plaintiff was prescribed the medication Risperdal at Lifelong Clinic and that Plaintiff stated that the medication was helpful. AR 359. Plaintiff denied having any suicidal ideation, and on mental status examination, Plaintiff was alert, had clear speech and "good" grooming, made good eye contact, and was cooperative (though a poor historian). *Id*.

On February 14, 2013, Dr. Boroff completed a Mental Impairment Questionnaire. AR 347-51. Dr. Boroff stated that Plaintiff exhibited signs and symptoms included paranoia and suspiciousness, his list of prescribed medications showed Remeron and Risperdal, and he experienced side effects of drowsiness, lethargy, and weight gain. AR 347-48. Dr. Boroff gave a prognosis of "Poor. Permanently disabled" and the list of clinical findings demonstrating the severity of Plaintiff's mental impairment and symptoms shows that Plaintiff has: depressed mood, incongruent affect, impaired memory and focus, below-average intelligence, limited insight, poor judgment, and reports of auditory hallucinations and paranoia. AR 347.

Dr. Boroff opined that Plaintiff was seriously limited, but not precluded from carrying out

12

very short and simple instructions, making simple work-related decisions, responding appropriately to changes in a routine work setting, and adhering to basic standards of neatness and cleanliness.  AR 348-49.  Dr. Boroff also noted that Plaintiff had limited but satisfactory ability to ask simple questions, be aware of normal hazards and take appropriate precautions, travel in an unfamiliar place, and use public transportation.  AR 349.  Dr. Boroff opined that Plaintiff was unable to meet competitive standards or had no useful function in all other mental abilities and aptitudes needed to do unskilled work and semiskilled to skilled work, and to do particular types of jobs.  *Id.*  Such abilities and aptitudes include maintaining regular attendance, working in coordination with or proximity to others without being unduly distracted, completing a normal workday and workweek without interruptions from psychologically-based symptoms, getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, dealing with normal stress, interacting appropriately with the general public, and maintaining socially-appropriate behavior.  *Id.*

Dr. Boroff reported that Plaintiff's anger and paranoia severely impaired Plaintiff's social functioning.  AR 349.  He opined that Plaintiff had moderate restriction of activities of daily living, extreme difficulties in maintaining social functioning, marked deficiencies in concentration, persistence, or pace, and one or two episodes of decompensation within a twelve-month period, each of at least two weeks duration.  AR 350.  He also opined that Plaintiff had a "Medically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least [two] years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medication or psychosocial support," and "A residual disease process that . . . resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to compensate."  AR 350-51.  Dr. Boroff noted that the impairments lasted or can be expected to last at least twelve months.  AR 351.

On February 5, 2013, Plaintiff was initially screened for psychiatric treatment at Alameda County Behavioral Health Care Services, but he eventually asked to be rescheduled because he

13

felt it was too long a wait.  AR 357-60.

On February 19, 2013, Neelam Sachdev, M.D., at Alameda County Behavioral Health Care Services reported that Plaintiff was alert, oriented, and cooperative, made fairly good eye contact, and had clear speech, anxious and depressed mood, a somewhat dysthymic affect, linear thought processes, and no suicidal or homicidal ideation or auditory or visual hallucinations.  AR 361.  Plaintiff reported that the medication Buspar helped him with his problem of biting the skin on his fingers.  *Id.*

On March 5 and 19, 2013, Dr. Sachdev reported that Plaintiff did not attend his scheduled appointments.  AR 363-64.

On April 9, 2013, Plaintiff informed Dr. Sachdev that he had been to Santa Rita Jail more than twenty-five times since 1998, that he had taken the medications Buspar and Remeron, which had helped him, and that he had received treatment at LifeLong.  AR 365.  Dr. Sachdev reported that Plaintiff denied experiencing feelings of paranoia, having auditory or visual hallucinations, and having any suicidal or homicidal ideation.  *Id.*  Plaintiff told Dr. Sachdev that he was sleeping and eating "good."  *Id.*  Dr. Sachdev reported that on mental status examination, Plaintiff appeared to be somewhat guarded but spoke clearly and mostly coherently, described his own mood as "fine," had a guarded affect, and was a little hypomanic, with what appeared to be some loose and circumstantial thought processing.  AR 365-66.  Dr. Sachdev described Plaintiff as "grandiose" based on his statements that his uncle is the famous baseball player Willie Mays, that all his incarcerations were a result of being "set up," and that many women wanted Plaintiff and would say untrue things about him if he tried to leave them.  AR 365-66.  Dr. Sachdev recommended that Plaintiff continue with the medications Remeron and Buspar and that he follow up with Dr. Sachdev in four months.  AR 366.  Plaintiff refused to take any anti-psychotic medication, such as Risperdal, Lithium, or Dekapote.  *Id.*

On May 21, 2013, Dr. Sachdev reported that Plaintiff was a no-show for his appointment, but he was continued on the medications Remeron and Buspar.  AR 367.

On September 5, 2013, Plaintiff visited LifeLong Medical Care after previously seeing Dr.

14

1    Wilmer in 2012; he was returning after his recent incarceration at Santa Rita Jail in order to re-

2    establish care. AR 373. Plaintiff had no changes in medication, denied having any suicidal or

3    homicidal ideation or auditory hallucinations, reported that medication helped his mood, and

4    requested a referral for physical therapy because of a leg injury he suffered in 2011. AR 373.

5         On January 13, 2014, Plaintiff visited Serena Wu, M.D., at LifeLong Medical Care

6    because he was experiencing pain in his right knee and he additionally wanted to get his

7    medication refilled. AR 369. Dr. Wu noted that although Plaintiff was previously referred for

8    physical therapy, he never followed-up, and although he was referred to a psychiatrist during his

9    previous visit to LifeLong Medical Care on September 5, 2013, he did not attend his scheduled

10   appointment. *Id.*

11        On November 4, 2010, Plaintiff completed a Function Report. AR 130-37. He reported

12   that he lived in a room with family and friends (AR 130) and that his friend gave him rides to his

13   appointments since Plaintiff found using public transportation "hard" (AR 133). He also reported

14   that he could pay bills and handle his own finances (AR 133), had difficulty tying his shoes and

15   putting on his clothes (AR 131), and could not walk a block before needing to rest (AR 135).

16   Plaintiff reported having problems lifting, squatting, bending, standing, reaching, walking,

17   kneeling, climbing stairs, using his hands, seeing, understanding, and following instructions, and

18   stated that he could only pay attention for five to ten minutes. AR 135. He reported that he

19   suffered from insomnia, felt sad all the time, did not want to "face the public," "would prefer not

20   to go outside" but forced himself to go to his appointments, and could not be around people. AR

21   130, 135. He stated that he had no problem with authority figures. AR 136.

22                    **SOCIAL SECURITY ADMINISTRATION PROCEEDINGS**

23        On October 16, 2010, Plaintiff filed a claim for Disability Insurance Benefits, alleging

24   disability beginning on October 1, 2009. AR 87-92, 104. On November 24, 2010, the Social

25   Security Administration ("SSA") denied Plaintiff's claim, finding that Plaintiff did not qualify for

26   disability benefits. AR 104. Plaintiff subsequently filed a request for reconsideration, which was

27   denied on April 23, 2012. AR 105, 148-55. On June 6, 2012, Plaintiff requested a hearing before

28

United States District Court
Northern District of California

15

an Administrative Law Judge ("ALJ").  AR 156-63.  However, Plaintiff did not appear at the

scheduled hearing, held on February 4, 2014.  AR 392.  His attorney, Ann Rubenstein, did appear.

AR 392.  ALJ Nancy Lisewski failed to find good cause for failure to appear and found that

Plaintiff was not a necessary party.  AR 14.  The ALJ heard testimony from Vocational Expert Jeff

Clark.  AR 393-96.

**A.      Vocational Expert's Testimony**

        The ALJ posed two hypotheticals to the vocational expert.  AR 393-95.  In the first, the

ALJ asked the vocational expert to consider "an individual [with] the same age, education, [and]

work background [as Plaintiff].  This person would be limited to simple, routine work, and the

work should involve no more than occasional social contact with coworkers and supervisors, [and]

no contact with the public."  AR 394.  The vocational expert testified that such a person would be

able to perform the work of sorter (Dictionary of Occupational Titles ("DOT") 739.687-182),

assembler (DOT 726.687-030), line worker (DOT 529.687-010), and cleaner (DOT 323.687-01

through DOT 323.687-014).  AR 394-95.

        The ALJ posed the second hypothetical as follows: "My second hypothetical is based on

[the December 14, 2011 Mental Impairment Questionnaire prepared by Dr. Spivey (AR 283-87)],

there are a number of limits, I'm just going to give you a few.  If a person was off task at least 25

percent of the day and could not get along with coworkers, supervisors or the public at all, would

there be any past relevant alternative work?"  AR 395.  The vocational expert testified that "[t]he

first limitation there alone would eliminate all work."  *Id.*

**B.      The ALJ's Findings**

        The regulations promulgated by the Commissioner of Social Security provide for a five-

step sequential analysis to determine whether a Social Security claimant is disabled.[2]  20 C.F.R. §

404.1520.  The sequential inquiry ends when "a question is answered affirmatively or negatively

---

[2] Disability is "the inability to engage in any substantial gainful activity" because of a medical
impairment which can result in death or "which has lasted or can be expected to last for a
continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

16

United States District Court
Northern District of California

in such a way that a decision can be made that a claimant is or is not disabled." *Pitzer v. Sullivan*, 908 F.2d 502, 504 (9th Cir. 1990).  During the first four steps of this sequential inquiry, the claimant bears the burden of proving that he or she is disabled.  *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 689 (9th Cir. 2009).  At step five, the burden shifts to the Commissioner "to show that the claimant can do other kinds of work."  *Id.* (quoting *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988)).

The ALJ must first determine whether the claimant is performing "substantial gainful activity," which would mandate that the claimant be found not disabled regardless of his medical condition, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(i), (b).  Here, the ALJ determined that Plaintiff had not performed substantial gainful activity since October 16, 2010, the application date.  AR 16.

At step two, the ALJ must determine, based on medical findings, whether the claimant has a "severe" impairment or combination of impairments as defined by the Social Security Act.  20 C.F.R. § 404.1520(a)(4)(ii).  If the ALJ determines that the claimant has no severe impairment, the ALJ finds that the claimant is not disabled.  20 C.F.R. § 404.1520(c).  Here, the ALJ determined that Plaintiff had the following "severe" impairments: mood disorder and status post tibial fracture.  AR 16.

If the ALJ determines that the claimant has a severe impairment, the process proceeds to the third step, when the ALJ must determine whether the claimant has an impairment or combination of impairments that "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpt. P, App. 1 (the "Listing of Impairments").  20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment either meets the listed criteria for the diagnosis or is medically equivalent to the criteria of the diagnosis, the ALJ concludes that the claimant is disabled, without considering the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).  Here, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the severity of any of the impairments in the listing.  AR 17.

Before proceeding to step four, the ALJ must assess the claimant's Residual Function

United States District Court
Northern District of California

17

Capacity ("RFC").  20 C.F.R. § 404.1520(e).  RFC refers to what an individual can do in a work

setting, despite mental or physical limitations caused by impairments or related symptoms.  20

C.F.R. § 404.1545(a)(1).  In assessing an individual's RFC, the ALJ must consider the limiting

effects of all of the claimant's medically determinable impairments, including those of the

medically determinable impairments that are not severe.  20 C.F.R. § 404.1545(e).  Here, the ALJ

determined that Plaintiff has the RFC to perform light work[3] "except that he is limited to simple,

routine work with no more than occasional contact with co-workers or supervisors, and no contact

with the public."  AR 18.

The fourth step of the evaluation process requires that the ALJ determine whether the

claimant's RFC is sufficient to perform past relevant work.  20 C.F.R. §§

404.1520(a)(4)(iv);404.1520(f).  Past relevant work is work performed within the past 15 years

that was substantial gainful activity, and that lasted long enough for the claimant to learn to do the

work.  20 C.F.R. § 404.1560(b)(1).  If the claimant has the RFC to do his past relevant work, the

claimant is not disabled.  20 C.F.R. § 404.1520(a)(4) (iv).  Here, the ALJ determined that Plaintiff

had no past relevant work.  AR 21.

Once the burden shifts at the fifth step of the analysis, the Commissioner must prove that

there are other jobs existing in significant numbers in the national economy that the claimant can

perform that are consistent with the claimant's RFC, age, education, and work experience.  20

C.F.R. §§  404.1520(g); 404.1560(c).  The Commissioner can meet this burden by relying on the

testimony of a vocational expert or by reference to the Medical-Vocational Guidelines at 20

C.F.R. pt. 404, Subpt. P, App. 2.  *Lounsbury v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006).  If

other jobs exist in significant numbers in the national economy, and the claimant can perform

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this
category when it requires a good deal of walking or standing, or when it involves sitting most of
the time with some pushing and pulling of arm or leg controls. To be considered capable of
performing a full or wide range of light work, you must have the ability to do substantially all of
these activities. If someone can do light work, we determine that he or she can also do sedentary
work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for
long periods of time."  20 C.F.R. § 416.967.

United States District Court
Northern District of California

1    these jobs, the claimant is not "disabled," and is therefore not entitled to disability insurance

2    benefits.  *Id.*  Here, based on the testimony of the vocational expert, and the Plaintiff's age,

3    education, work experience, and RFC, the ALJ determined that there were jobs that exist in

4    significant numbers in the national economy that Plaintiff could perform, including sorter, line

5    worker, and cleaner.  AR 22.

6    **C.      ALJ's Decision and Plaintiff's Appeal**

7           On February 21, 2014, the ALJ issued an unfavorable decision finding that Plaintiff was

8    not disabled.  AR 11-23.  This decision became final when the Appeals Council declined to review

9    it on April 29, 2015.  AR 5-7.  Having exhausted all administrative remedies, Plaintiff commenced

10   this action for judicial review pursuant to 42 U.S.C. § 405(g).  On October 16, 2015, Plaintiff filed

11   the present Motion for Summary Judgment.  Dkt. No. 17.  On March 23, 2016, Defendant filed a

12   Cross-Motion for Summary Judgment.  Dkt. No. 29.

13                                   **LEGAL STANDARD**

14          This Court has jurisdiction to review final decisions of the Commissioner pursuant to 42

15   U.S.C. § 405(g).  The ALJ's decision must be affirmed if the findings are "supported by

16   substantial evidence and if the [ALJ] applied the correct legal standards."  *Holohan v. Massanari*,

17   246 F.3d 1195, 1201 (9th Cir. 2001) (citation omitted).  "Substantial evidence means more than a

18   scintilla but less than a preponderance" of evidence that "a reasonable person might accept as

19   adequate to support a conclusion."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002)

20   (quoting *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995)).  The

21   court must consider the administrative record as a whole, weighing the evidence that both supports

22   and detracts from the ALJ's conclusion.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).

23   However, "where the evidence is susceptible to more than one rational interpretation," the court

24   must uphold the ALJ's decision.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  The

25   ALJ is responsible for making determinations about credibility, resolving conflicts in medical

26   testimony, and resolving ambiguities.  *Id.*

27          Additionally, the harmless error rule applies where substantial and substantive evidence

28                                           19

United States District Court
Northern District of California

United States District Court
Northern District of California

1   otherwise supports the ALJ's decision.  *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990).  A

2   court "may not reverse an ALJ's decision on account of an error that is harmless."  *Molina v.*

3   *Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d

4   1050, 1055-56 (9th Cir. 2006)).  "'[T]he burden of showing that an error is harmful normally falls

5   upon the party attacking the agency's determination.'"  *Id*. (quoting *Shinseki v. Sanders*, 556 U.S.

6   396, 409 (2009)).

## DISCUSSION

8       Plaintiff raises six issues in his Motion.  Specifically, Plaintiff questions whether the ALJ

9   properly: (1) found that Plaintiff was not an essential witness, (2) found that Plaintiff did not have

10  severe impairments of psychosis and intellectual disability at step two, (3) evaluated the opinions

11  of Plaintiff's treating source, Dr. Boroff, and examining sources, Drs. Wiebe and Spivey, (4)

12  found that Plaintiff did not meet a listed impairment, (5) determined and assessed Plaintiff's RFC,

13  and (6) evaluated Plaintiff's credibility.  Pl.'s Mot. at 1.

14  **A.      Whether the ALJ Erred in Finding that Plaintiff was not an Essential Witness**

15      Plaintiff first argues he was a necessary witness at the hearing.  Pl.'s Mot. at 4-5.  He notes

16  that the hearing was originally scheduled for early 2013, but that he was incarcerated at the time.

17  *Id*. at 4.  Plaintiff's representative appeared at that hearing and informed the ALJ, Major Williams,

18  that Plaintiff would be unable to attend.  *Id*.  According to Plaintiff, ALJ Williams chose to

19  postpone the hearing, even though Plaintiff's representative was available to appear, and a new

20  hearing was not scheduled for nearly a year.  *Id*.  Plaintiff contends that there was no reason for

21  this postponement if he was not a necessary party.  *Id*.  With regard to the February 4, 2014

22  hearing, Plaintiff argues the ALJ committed error by relying on statements Plaintiff made in

23  function reports, without allowing him the opportunity to testify.  *Id*. at 5.  Plaintiff maintains he

24  had good cause for failing to appear at the hearing because his mental health conditions prevented

25  him from attending.  *Id*.

26      In response, Defendant argues the ALJ properly proceeded with the hearing because she

27  found that the Plaintiff failed to establish good cause for his failure to appear.  Def.'s Mot. at 4.

28                                          20

As a preliminary matter, Plaintiff's argument relies on *McNatt v. Apfel*, 201 F.3d 1084, 1088 (9th Cir. 2000).  Pl.'s Mot. at 4.  In *McNatt*, the court considered the ALJ's dismissal of a request for hearing and cited SSA's Hearing, Appeals, and Litigation Law Manual ("HALLEX") provision 1–2–425(D), which, at the time of *McNatt*, provided that "if a claimant's representative appears at a scheduled hearing without the claimant, the ALJ must determine whether the claimant is an essential witness for a proper determination of the case."  *McNatt*, 201 F.3d at 1088.  If the claimant is not an essential witness, the ALJ should proceed with the hearing.  *Id.*  If the ALJ determines that the claimant is an essential witness, the ALJ should offer to postpone the hearing so that the claimant may appear.  *Id.*  However, although the Ninth Circuit has recognized that HALLEX, as an agency manual, is "entitled to respect . . . to the extent it has the power to persuade," *McNatt* refers to an outdated HALLEX section that was materially amended prior to the events at issue here.  *Clark v. Astrue*, 529 F.3d 1211, 1216 (9th Cir. 2008).  The pertinent provision, amended on July 22, 2005, now provides:

> If a claimant's representative appears at a scheduled hearing without the claimant:
>
> 1. The ALJ may determine that the claimant has constructively waived the right to appear at the hearing if the representative is unable to find the claimant, the notice of hearing was mailed to the claimant's last known address, and the contact procedures of 20 CFR §§ 404.938 and 416.1438 have been followed.
>
> If the hearing includes expert witnesses, the ALJ may choose to proceed with the hearing, accepting the testimony of the witnesses and allowing the claimant's representative to question the witnesses and make arguments regarding the claimant's application.
>
> The ALJ should advise the claimant's representative that a Notice to Show Cause will be issued asking the claimant why he or she did not appear, and why a supplemental hearing should be held. If the claimant fails to respond to the Notice to Show Cause or fails to provide good cause for failure to appear at the scheduled hearing, the ALJ may then determine that the claimant has constructively waived his or her right to appear for a hearing, and the ALJ may issue a decision on the record.
>
> 2. If the claimant provides good cause for failure to appear, the ALJ will offer the claimant a supplemental hearing to provide testimony.

HALLEX § I-2-4-25(D).  "Unlike the prior version of this HALLEX provision, the current version

21

1    does not require the ALJ to make a finding as to whether or not plaintiff is an essential witness."

2    *Culp v. Astrue*, 2008 WL 2620381, at \*5 n.5 (C.D. Cal. June 30, 2008).

3          The record instead reflects that the ALJ materially complied with the procedures set forth

4    in the updated HALLEX provision.  Notices of the hearings were sent to Plaintiff's last known

5    address.  AR 37, 43.  When Plaintiff failed to appear at the February 4, 2014 hearing, the ALJ

6    advised Plaintiff's counsel that a notice to show cause would be issued.  AR 392, 396-97.  On

7    February 4, 2014, the notice was issued and sent to Plaintiff.  AR 28.  Plaintiff responded that he

8    did not appear due to difficulty being around people.  AR 27.  "The burden [i]s on [Plaintiff] 'to

9    show good cause for his failure to attend the hearing.'"  *Parrish v. Colvin*, 2015 WL 5095310, at

10   \*3 (S.D. Ga. Aug. 28, 2015) (quoting *Rodriguez v. Astrue*, 2011 WL 1085528 at \*4 (S.D. Fla.

11   Mar. 1, 2011)).  The ALJ found that, although Plaintiff claimed he had difficulty being around

12   others, the record did not support his claim, and, even if it did, there was no reason to believe he

13   would appear at a rescheduled hearing either.  AR 14.  "Under HALLEX, good cause for failing to

14   appear at a scheduled hearing exists, as relevant here, when an unforeseeable event occurred that

15   did not provide the claimant or the appointed representative enough time to notify the ALJ and

16   request a postponement before the scheduled hearing."  *Parrish*, 2015 WL 5095310, at \*2 (citing

17   *Carpenter v. Colvin*, 2014 WL 4637085, at \*3 (N.D.N.Y. Sept. 16, 2014)).  It is not clear how

18   difficulty being around other people constitutes an unforeseeable event when, as Plaintiff argues,

19   his difficulty is "well documented."  Pl.'s Mot. at 5.  Further, the ALJ also found he was not a

20   necessary party because he made his appearance through a designated representative.  AR 14.

21   Thus, there was no need for the ALJ to offer Plaintiff a supplemental hearing.  *See Morales v.*

22   *Astrue*, 504 F. App'x 592, 592 (9th Cir. 2013) (finding that the ALJ properly deemed the plaintiff

23   "a non-essential witness" because the record already contained statements from him concerning

24   his claimed disability, the ALJ considered the fact that plaintiff's counsel was present at the

25   hearing on his behalf, and the plaintiff's frequent incarcerations made rescheduling likely to result

26   in further delays).

27          Accordingly, because the ALJ complied with the HALLEX provision and Plaintiff failed

28
                                                    22

1   to establish good cause for his failure to attend the hearing, the ALJ's decision is free of legal error

2   and must be affirmed.

3   **B.      Whether the ALJ Erred in Determining Plaintiff's Severe Impairments**

4        Plaintiff argues that the ALJ erred at step two in of the analysis by not finding his

5   psychosis and intellectual disability were also severe impairments.  Pl.'s Mot. at 5-6.  Defendant

6   argues substantial evidence supported the ALJ's evaluation of Plaintiff's mental impairments on

7   his ability to work and her determination that the impairments were not severe.  Def.'s Mot. at 6-7.

8        At step two, the ALJ must determine, based on the objective evidence in the record,

9   whether the claimant has proven that he has a "severe" impairment – meaning, a medically

10   determinable impairment or combination of impairments that "significantly limits [the claimant's]

11   physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c); *see also* 20 C.F.R.

12   § 416.920(a)(4)(ii).  An impairment is severe if it significantly affects the claimant's physical or

13   mental ability to perform basic work activities, such as lifting, carrying, standing, walking, and

14   sitting, and carrying out simple instructions.  20 C.F.R. § 416.921.  An impairment is "not severe"

15   if it is only a slight abnormality, or combination of slight abnormalities, that has no more than a

16   minimal effect on the individual's ability to perform basic work activities.  Social Security Ruling

17   ("SSR") 96-3p, 1996 WL 374181, at *1 (July 2, 1996).  The claimant bears the burden of making

18   a threshold showing of medical severity.  *Bowen v. Yuckert*, 482 U.S. 137, 149-50 (1987).

19        Here, the ALJ found Plaintiff had a severe mental impairment, that being mood disorder.

20   AR 16.  Although Plaintiff objects that the ALJ did not specifically identify his other mental

21   impairments of psychosis and intellectual disability as severe, the fact that Plaintiff had at least

22   one severe mental impairment meant the ALJ had to consider the functional effect of all of his

23   impairments, severe and non-severe.  *See* SSR 96-8p, 1996 WL 374184 at *5 (July 2, 1996) ("In

24   assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an

25   individual's impairments, even those that are not 'severe'"); SSR 85-28, 1985 WL 56856, at *3

26   (January 1, 1985) ("A claim may be denied at step two only if the evidence shows that the

27   individual's impairments, when considered in combination, are not medically severe, i.e., the

28                                                23

United States District Court
Northern District of California

1   combined impairments do not have more than a minimal effect on the person's physical or mental

2   ability(ies) to perform basic work activities.  If such a finding is not clearly established by medical

3   evidence, however, adjudication must continue through the sequential evaluation process").

4   Therefore, the identification of his mental impairments as severe or non-severe was irrelevant, so

5   long as the ALJ considered all impairments as part of the sequential analysis.

6         Further, "omissions at step two are often harmless error if step two is decided in plaintiff's

7   favor."  *Nicholson v. Colvin*, 106 F. Supp. 3d 1190, 1195 (D. Or. 2015) (citing *Burch v. Barnhart*,

8   400 F.3d 676, 682 (9th Cir. 2005) (concluding that any error the ALJ committed at step two was

9   harmless because it did not alter the outcome of step two, and the step was resolved in claimant's

10   favor); *see also Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (finding harmless an ALJ's

11   failure to list certain impairment at step two where the ALJ fully evaluated the impairment at step

12   four); *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (if one severe impairment exists, all

13   medically determinable impairments, and their combined impact on the claimant's RFC and

14   ability to perform work, must be considered in the remaining steps of the sequential analysis)

15   (citing 20 C.F.R. § 404.1523)).  Step two serves only to eliminate groundless claims of disability

16   from claimants who have no impairments or combination of impairments that sufficiently limit

17   their functionality to constitute severe impairments.  *Smolen*, 80 F.3d at 1290 ("the step-two

18   inquiry is a de minimis screening device to dispose of groundless claims").  Thus, as the ALJ

19   found that Plaintiff had severe impairments and completed the sequential analysis, considering all

20   of Plaintiff's severe and non-severe impairments, any error in failing to name additional mental

21   impairments as severe is harmless.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1042-43 (9th Cir.

22   2008) (error that is inconsequential to the ultimate nondisability determination is harmless error)

23   (quotations and citations omitted); *Molina*, 674 F.3d at 1111.  Accordingly, the ALJ's decision

24   must be affirmed.

25   **C.    Whether the ALJ Erred in the Evaluation of Medical Opinion Evidence**

26         Plaintiff argues the ALJ erred in her evaluation of the opinions of Drs. Michael Boroff,

27   Katherine Wiebe, and William Spivey.  Pl.'s Mot. at 6-12.  The Court considers each in turn.

28
                                                 24

United States District Court
Northern District of California

United States District Court
Northern District of California

1        1.     Legal Standard

When determining whether a claimant is disabled, the ALJ must consider each medical

opinion in the record, together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b);

*Zamora v. Astrue*, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  In deciding how much

weight to give to any medical opinion, the ALJ considers the extent to which the medical source

presents relevant evidence to support the opinion.  *See* 20 C.F.R. § 416.927(c)(3).  Generally,

more weight will be given to an opinion that is supported by medical signs and laboratory

findings, provides supporting explanations for opinions, and is consistent with the record as a

whole.  20 C.F.R. § 416.927(c)(3)-(4).

In conjunction with the relevant regulations, the Ninth Circuit "developed standards that

guide [the] analysis of an ALJ's weighing of medical evidence."  *Ryan v. Comm'r of Soc. Sec.*,

528 F.3d 1194, 1198 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527).  Courts "distinguish among the

opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2)

those who examine but do not treat the claimant (examining physicians); and (3) those who neither

examine nor treat the claimant (nonexamining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830

(9th Cir. 1995).  "By rule, the Social Security Administration favors the opinion of a treating

physician over non-treating physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing

20 C.F.R. § 404.1527(c)(2)).  If a claimant has a treatment relationship with a provider, and

clinical evidence supports that provider's opinion and is consistent with the record, the provider's

opinion will be given controlling weight.  20 C.F.R. § 416.927(c)(2).  "The opinion of a treating

physician is given deference because 'he is employed to cure and has a greater opportunity to

know and observe the patient as an individual.'"  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169

F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)).

"If a treating physician's opinion is not given 'controlling weight' because it is not 'well-

supported' or because it is inconsistent with other substantial evidence in the record, the [SSA]

considers specified factors in determining the weight it will be given."  *Orn*, 495 F.3d at 631.

"Those factors include the '[l]ength of the treatment relationship and the frequency of

25

examination' by the treating physician; and the 'nature and extent of the treatment relationship' between the patient and the treating physician."  *Id*. (citing 20 C.F.R. § 404.1527(c)(2)(i)-(ii)).

> Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; the specialty of the physician providing the opinion; and "[o]ther factors" such as the degree of understanding a physician has of the [Social Security] Administration's "disability programs and their evidentiary requirements" and the degree of his or her familiarity with other information in the case record.

*Id*. (citing 20 C.F.R. § 404.1527(c)(3)-(6)).  Nonetheless, even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference.  *See Orn*, 495 F.3d at 632 (citing SSR 96-2p,[4] 1996 WL 374188, at *4 (July 2, 1996)).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p at *4.

In addition, an examining physician's opinion constitutes substantial evidence because it rests on the physician's own independent examination of the claimant, and it may serve as substantial evidence supporting the ALJ's finding as to a claimant's impairment and limitations. *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).  An ALJ may reject another physician's opinion based on an examining physician's or non-examining physician's opinion.  *Id*. An ALJ may also rely on a non-examining physician's opinion to determine a claimant's limitations.  *Bray v. Astrue*, 554 F.3d 1219, 1221-22 (9th Cir. 2009).

### 2.    Dr. Boroff

There is no dispute that Dr. Boroff is Plaintiff's treating physician.  Pl.'s Mot. at 6; Def.'s Mot. at 8.  As summarized above, Dr. Boroff conducted a psychological evaluation based on meetings with Plaintiff on August 30, 2012, October 31, 2012, December 13, 2012, December 27,

---

[4] "[Social Security Rulings] do not carry the 'force of law,' but they are binding on ALJs nonetheless."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see* 20 C.F.R. § 402.35(b)(1).  The Ninth Circuit defers to the rulings unless they are "plainly erroneous or inconsistent with the Act or regulations."  *Chavez v. Dep't of Health and Human Servs.*, 103 F.3d 849, 851 (9th Cir. 1996) (quoting *Quang Van Han v. Bowen,* 882 F.2d 1453, 1457 (9th Cir. 1989)).

United States District Court
Northern District of California

2012, and January 14, 2013.  AR 353-54.  He completed a Mental Impairment Questionnaire on February 14, 2013.  AR 347-51.  Dr. Boroff gave a prognosis of "Poor. Permanently disabled" based on Plaintiff's depressed mood, incongruent affect, impaired memory and focus, below-average intelligence, limited insight, poor judgment, and reports of having auditory hallucinations and feelings of paranoia.  AR 347.  Dr. Boroff opined that Plaintiff was seriously limited in, but not precluded from, carrying out very short and simple instructions, making simple work-related decisions, responding appropriately to changes in a routine work setting, and adhering to basic standards of neatness and cleanliness, and that Plaintiff had limited but satisfactory ability to ask simple questions or request assistance, be aware of normal hazards and take appropriate precautions, travel in an unfamiliar place, and use public transportation.  AR 348-49.  Dr. Boroff otherwise found Plaintiff was unable to meet competitive standards or had no useful function in all other mental abilities and aptitudes needed to perform unskilled work and semiskilled to skilled work, and to do particular types of jobs – such as maintain regular attendance, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms, get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes, deal with normal stress, interact appropriately with the general public, and maintain socially appropriate behavior.  *Id.*  Dr. Boroff also reported that Plaintiff's anger and paranoia severely impaired his social functioning.  AR 349.  Dr. Boroff opined that Plaintiff's mental impairments posed a moderate restriction of activities of daily living, provided for extreme difficulties in maintaining social functioning, created marked deficiencies of concentration, persistence, or pace, and produced one or two episodes of decompensation within a twelve-month period, each of at least two weeks duration.  AR 350.  Dr. Boroff opined that the impairments lasted or could be expected to last at least twelve months.  AR 351.

The ALJ gave "no weight" to Dr. Boroff's assessment, finding it was based, in large part, on Plaintiff's reported symptoms and was not consistent with his accompanying treatment records.  AR 20.  The ALJ noted Dr. Boroff stated that Plaintiff struggles to control his paranoia and anger,

United States District Court
Northern District of California

even when medicated, yet Plaintiff's progress notes contain "ample evidence" that he reported doing well on medication, and denied having feelings of paranoia and experiencing hallucinations. *Id*. The ALJ also noted Dr. Boroff found that Plaintiff was oriented, cooperative, and engaged when he attended therapy sessions, and that although Plaintiff reported a depressed mood, Dr. Boroff noted Plaintiff's affect was not mood-congruent and that paranoia and auditory hallucinations "were not apparent" in Plaintiff's sessions. *Id*.

Plaintiff raises several arguments as to why the ALJ's decision must be reversed. First, Plaintiff argues the ALJ improperly gave Dr. Boroff's opinion no weight because Plaintiff was referred to him by his attorney. Pl.'s Mot. at 7. However, although the ALJ notes the Homeless Action Center referred Plaintiff to Dr. Boroff, she does not state this as a reason for rejecting Dr. Boroff's opinion. This argument is without merit.

Second, Plaintiff argues Dr. Boroff's opinion was based on more than just Plaintiff's reported symptoms, noting that he met with Dr. Boroff five times, and Dr. Boroff "used his experience and training as a psychologist to assess and interview Mr. Mays in those sessions." *Id*. at 7-8. He points out that Dr. Boroff also reviewed records from other providers and noted previous diagnoses of MDD, Intermittent Explosive Disorder, and Paranoid Schizophrenia. *Id*. at 8. Plaintiff contends there is nothing in the record indicating that Dr. Boroff relied on Plaintiff's statements more heavily than on his own clinical observations, his expertise in psychology, or other noted methods and sources of information. *Id*.

Third, Plaintiff argues Dr. Boroff's assessment is consistent with his treatment notes. *Id*. While the ALJ points to areas in Dr. Boroff's notes where Plaintiff "reports doing well on medication, denies or down plays paranoia and hallucinations, was oriented, cooperative and engaged, and his affect was not mood congruent," he maintains Dr. Boroff's conclusions are consistent with these notes because he lists incongruent affect as a clinical finding and specifically "acknowledges the inconsistencies of [Plaintiff's] reporting regarding psychosis: 'While his reports of his psychotic symptoms have varied depending on who he was taking to, it seems clear that he is suffering from some level of psychosis.'" *Id*. (quoting AR 354). Regarding doing well

United States District Court
Northern District of California

1   on medication, Plaintiff contends "the details are more nuanced then the ALJ presents," because

2   "Dr. Boroff's notes show that while Mr. Mays takes Remeron 'to make the voices go away,' 'he

3   still experiences AH at times.'  *Id*. (quoting AR 345).  Plaintiff notes Dr. Boroff found that

4   "'[w]hen on medication, [Plaintiff] feels much better. However, even with medication, he has to

5   avoid people, as they trigger his anger.'"  *Id*. at 8-9 (quoting AR 340).

6          Despite Plaintiff's arguments to the contrary, the Court finds the ALJ properly rejected Dr.

7   Boroff's opinion based on its lack of evidentiary support by the clinical findings in the record and

8   lack of consistency with the record evidence as a whole.  *See* 20 C.F.R. § 416.927(c)(3), (4);

9   *Thomas*, 278 F.3d at 957.  As the ALJ noted, while Dr. Boroff opined that Plaintiff struggled with

10  paranoia and hallucinations (AR 20, 347, 349), notes on Plaintiff's progress indicate that he was

11  doing well on medication and denied having feelings of paranoia and experiencing hallucinations

12  when compliant with his prescribed medication treatment.  AR 20; *see, e.g.*, AR 345-46 (August

13  30, 2012: Plaintiff reported taking Risperdal for making the voices go away and that his last

14  auditory hallucination was a year prior; Plaintiff currently denied having auditory and visual

15  hallucination, denied experiencing paranoia and delusions, and was fully alert and oriented); 343-

16  44 (October 31, 2012: Dr. Boroff reported that Plaintiff reported having frequent auditory

17  hallucinations but was not observed to be attending to them in the session; Plaintiff reported

18  having significant feelings of paranoia); AR 340 (December 27, 2012: Plaintiff reported that his

19  mood was "down" due to his being out of medication and gave vague answers about his psychotic

20  symptoms, but denied hearing voices); 339 (January 14, 2013: Plaintiff in distress from hearing

21  voices again and being out of medication); 354 (in a psychological evaluation report regarding

22  Plaintiff's five visits, Dr. Boroff reported that Plaintiff claimed that he heard voices that

23  commanded him to hurt himself, though he denied having any suicidal or homicidal ideation, and

24  Plaintiff reported having intense feelings of paranoia, though neither paranoia nor auditory

25  hallucinations were apparent in sessions); AR 361 (February 19, 2013: Plaintiff denied having any

26  hallucinations); 365 (April 9, 2013: Plaintiff denied having hallucinations and feelings of

27  paranoia); 373 (September 5, 2013: Plaintiff denied having any hallucinations); 202 (September

28

1     10, 2010: Plaintiff was not taking Risperdal but had continued with the medication Paxil and was

2     "apparently not troubled by AH [auditory hallucinations] at this time – and may not have a

3     psychotic disorder – feels he does well just w[ith] Paxil and mood is controlled"); 200 (October 6,

4     2010: Plaintiff presented as "unsure of AH[,] as he first answered that he continues to have AH

5     but less than originally reported" and then "he said he did not have AH at all" and presented no

6     signs of psychosis); 220 (November 9, 2010: Plaintiff did not respond to internal stimuli or any

7     loose associations); 268 (November 7, 2011: Plaintiff denied recently experiencing auditory or

8     visual hallucinations while stating he had them "in the past"); 323 (July 26, 2012: Plaintiff did not

9     experience auditory or visual hallucinations, and did not show signs of experiencing delusions or

10    paranoid ideation)).

11            In addition, the ALJ properly noted that Dr. Boroff's own sessions indicated Plaintiff was

12    oriented, cooperative, and engaged, and that although Plaintiff reported having a depressed mood,

13    Dr. Boroff noted Plaintiff's affect was not always mood-congruent.  AR 20; *see, e.g.*, AR 354 (Dr.

14    Boroff reported that when examined, Plaintiff was oriented times four, as well as cooperative and

15    engaged, but self-reported that his mood was depressed, although his affect was not mood-

16    congruent); 359 (February 5, 2013: Plaintiff was alert, well groomed, and cooperative, and spoke

17    clearly, and made good eye contact,).  The inconsistency between Dr. Boroff's mental status

18    findings and opined limitations provided a sound reason to reject his opinion.  *See* 20 C.F.R. §

19    416.927(c)(2) (providing for consideration of medical opinions that are inconsistent internally or

20    inconsistent with other evidence); *Johnson v. Shalala*, 60 F.3d 1428, 1432-33 (9th Cir. 1995)

21    (holding that the ALJ may disregard even a treating physician's opinion when it is internally

22    inconsistent); *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (concluding that internal

23    inconsistencies and ambiguities within the doctor's opinion provided specific and legitimate

24    reasons for the ALJ to reject the opinion); *Valentine*, 574 F.3d at 692-93 (holding that a

25    contradiction between the treating physician's opinion and his treatment notes constitutes a

26    specific and legitimate reason for rejecting the treating physician's opinion); *Tommasetti*, 533 F.3d

27    at 1041 (concluding that incongruity between medical records and a treating physician's opinion

28                                                         30

United States District Court
Northern District of California

1    provided a specific and legitimate reason for rejecting the treating physician's opinion); *Rollins v.*

2    *Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (holding that the ALJ permissibly rejected the

3    treating physician's opinion when the opinion was contradicted by or inconsistent with treatment

4    reports); *Fisher v. Astrue*, 429 F. App'x 649, 652 (9th Cir. 2011) (concluding that conflict between

5    a doctor's opinion and the claimant's daily activities was a legally sound reason to discount the

6    doctor's opinion).

7          Records other than Dr. Boroff's sessions also supported the ALJ's finding.  *See* AR 180,

8    206 (June 15, 2010: Plaintiff was well-groomed, anxious, made good eye contact, was clear and

9    coherent, and found his prescribed medications helpful); 178, 203 (July 14, 2010: Plaintiff made

10   good eye contact, was cooperative, well-groomed, talkative, in a "good" mood, and "doing well"

11   on psychiatric medication, and spoke clearly and coherently); 202 (September 10, 2010: Plaintiff

12   "seems [to be] in [a] fairly good mood" and "feels [that] he does well just w[ith] Paxil and [his]

13   mood is controlled"); 199-200 (October 6, 2010: Plaintiff had a normal appearance, was calm and

14   cooperative, did not show signs of distress, and denied having any suicidal and homicidal ideation,

15   intent, or plan.  Plaintiff reported that he was "doing well on his current med[ications]" without

16   experiencing side effects, and had a good mood, was calm and appropriate, and agreed to continue

17   taking his medication); 219-20 (November 9, 2010: Plaintiff was oriented to person, place, time,

18   and purpose, had thought process and content evidenced by poor reality testing, had a flat affect,

19   had a fair mood, paid good attention, and had poor insight and judgment); 257-58 (July 21, 2011:

20   Plaintiff was cooperative and pleasant); 254 (August 29, 2011: Plaintiff was "clear" and

21   cooperative, he did not make abnormal movements during the session, and his speech was within

22   normal limits); 265, 268 (November 7, 2011: Plaintiff was well-groomed and casually dressed,

23   had an anhedonic mood, was mildly dysphoric, was generally dissociated, had a normal affect,

24   was cooperative during the interview, had normal flow of thought, appeared to have "slowed"

25   thinking with delayed responses, had vague speech, expressed suicidal ideation without intent, and

26   was oriented to person, place, and time); 323 (July 26, 2012: Plaintiff was alert, neatly dressed,

27   calm, and appropriate, had normal speech rate and rhythm, had a depressed mood  but did not

28

United States District Court
Northern District of California

appear to be depressed, had logical and coherent thought processes, had no suicidal or homicidal ideation, appeared to have normal cognition, and his affect was positive and within the normal range); 345-46 (August 30, 2012: Plaintiff was casually dressed, made poor eye contact, was "very cooperative," had slow and soft speech, described his mood as depressed and his affect as sad, had linear and logical thought processes, was fully alert and oriented, and had fair insight and poor judgment); 361 (February 19, 2013: Plaintiff was alert, oriented, and cooperative, made fairly good eye contact, had clear speech, had an anxious and depressed mood, had a somewhat dysthymic affect, had no suicidal or homicidal ideation, and had linear thought processes); 365-66 (April 9, 2013: Plaintiff was somewhat guarded, spoke clearly and mostly coherently, described his own mood as "fine," had a guarded affect, was a little hypomanic, and appeared to have some loose and circumstantial thought processing). *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (the ALJ properly discounted two treating doctors' opinions, in part, because other statements and assessments of the claimant's medical condition contradicted them); 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2) ("Objective medical evidence . . . is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect [of] those symptoms . . . ."); *Rollins*, 261 F.3d at 857 ("medical evidence is . . . a relevant factor in determining the severity of the claimant's pain and its disabling effects").

While Plaintiff may disagree with the ALJ's findings, the Court finds that the record before it constitutes substantial evidence supporting the ALJ's decision not to give Dr. Boroff's opinion controlling weight. Further, even "where the evidence is susceptible to more than one rational interpretation," the Court must uphold the ALJ's decision. *Magallanes*, 881 F.2d at 750; *see also Batson*, 359 F.3d at 1196 (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)) ("When evidence reasonably supports either confirming or reversing the ALJ's decision, we may not substitute our judgment for that of the ALJ."). The ALJ must resolve determinations of credibility, conflicts in medical testimony, and all other ambiguities. *Batson*, 359 F.3d at 1196; *Magallanes*, 881 F.2d at 750.

Thus, because the ALJ properly considered each medical opinion and found that Dr.

United States District Court
Northern District of California

1    Boroff's opinion was not supported by the record as a whole, the Court must uphold the ALJ's

2    decision.

3             3.       Drs. Wiebe and Spivey

4             There is no dispute that Drs. Wiebe and William Spivey are Plaintiff's examining

5    physicians.  Pl.'s Mot. at 9; Def.'s Mot. at 11.  Dr. Wiebe evaluated Plaintiff on November 7,

6    2011.  AR 265-80.  She diagnosed Plaintiff with MDD, R/O Schizophrenia, GAD, Learning

7    Disorder NOS, Schizoid Personality Disorder, avoidant personality traits with borderline

8    personality traits, paranoid personality features, and Schizotypal Personality Disorder.  AR 276-

9    77.  She found that Plaintiff has severe impairments in attention/concentration, social functioning,

10   activities of daily living (ADL's), short-term memory, long-term memory, and judgment/insight.

11   AR 279.  Dr. Wiebe opined that Plaintiff's symptoms made him unlikely to be able to complete

12   tasks assigned to him in a work setting, and that Plaintiff was easily fatigued, required reminders

13   to accomplish tasks, had difficulty leaving his home due to his paranoia, anxiety, and depression,

14   was limited in his ability to manage daily tasks and affairs, and had trouble with interpersonal

15   relationships because of his personality disorder symptoms.  AR 276.

16            The ALJ gave "very little weight" to Dr. Wiebe's evaluation, finding her one-time

17   evaluation to be of questionable impartiality given that Plaintiff saw her upon referral from the

18   Homeless Action Center, where Dr. Wiebe is a staff psychologist.  AR 20.  The ALJ also found

19   that Plaintiff's treatment records do not support "the extremity" of the limitations Dr. Wiebe said

20   Plaintiff has, given that Plaintiff's "treatment records show that he fares quite well when he is

21   compliant with [taking] his medication."  *Id.*

22            Dr. Spivey saw Plaintiff twice in 2010, and on December 14, 2011, Dr. Spivey filled out a

23   mental impairment questionnaire based on his evaluations of Plaintiff.  AR 282-87; Pl.'s Mot. at 9.

24   Dr. Spivey diagnosed Plaintiff with Major Depression and found that Plaintiff had marked

25   restrictions in activities of daily living, difficulties in maintaining social functioning, and

26   deficiencies in concentration, persistence, or pace.  AR 283, 286.  He also found that Plaintiff

27   suffered from episodes of decompensation.  AR 286.  The ALJ gave "minimal weight" to Dr.

28
                                                    33

Spivey's assessment, finding that his report "appears to be provided in the interest of claimant advocacy, and does not find support in the evidentiary file." AR 20. The ALJ noted that, although Dr. Spivey noted three episodes of decompensation, each lasting two weeks or more, Plaintiff "denied psychiatric hospitalizations, and the record otherwise contains no evidence of such decompensation." *Id.*

Plaintiff argues that the ALJ improperly rejected the opinions of Drs. Wiebe and Spivey, as their opinions are consistent with the records as a whole. Pl.'s Mot. at 10. Plaintiff notes that the doctors' reports are consistent with each other, as the reports document the doctors' findings that Plaintiff has extreme limitations in ADLs, social functioning, and CPP. *Id.* He also notes that the records are consistent with Dr. Boroff's diagnoses of "MDD, recurrent, moderate and Psychotic Disorder, NOS, and his findings of moderate impairments in ADLs, extreme impairments in social functioning and marked impairments in CPP." *Id.* As to other records, Plaintiff notes that Santa Rita Jail providers diagnosed Plaintiff with "Depression; R/O Bipolar disorder; Schizophrenia, paranoid type; Intermittent Explosive disorder; and Psychotic disorder, NOS; Mood disorder, NOS and assessed GAFs of 44 and 50"; and that Lifelong Medical Care providers diagnosed Plaintiff with "MDD and Borderline Intellectual Functioning by history[,] and Prescribed Remeron and Buspar." *Id.* Plaintiff further argues that "episodes of decompensation are not synonymous with period of psychiatric hospitalization" and that, while it is true that he has not been hospitalized, "he has shown other signs of decompensating," such as frequent periods of incarceration and homelessness, when he is unable to take care of the daily business of life. *Id.* at 11.[5]

As to Dr. Wiebe, the Court finds that the ALJ permissibly rejected her assessment, finding that Plaintiff's treatment records did not support the "extremity" of the limitations Dr. Wiebe

---

[5] As to the ALJ's finding that Dr. Wiebe's evaluation is of questionable impartiality, Plaintiff argues that the purpose for which medical reports are obtained does not provide a legitimate basis for rejecting them. Pl.'s Mot. at 10. However, the fact that an examination is conducted at the request of an attorney can be relevant where the opinion itself provides grounds for suspicion as to its legitimacy. *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). Regardless, the Court need not consider this argument, as the ALJ permissibly gave little weight to Dr. Wiebe's opinion based on other findings.

United States District Court
Northern District of California

deemed Plaintiff to have.  AR 20.  As the ALJ noted, the treatment records demonstrate that Plaintiff fared well when he was compliant with the prescribed medication treatment.  *Id.*; *see also, e.g.*, AR 199 (October 6, 2010: Dr. Rosenthal noted that Plaintiff reported "doing well on current med[ications]" without experiencing any side effects, and that Plaintiff was calm, appropriate, and in a good mood, and agreed to continue taking his medication, although he had not been taking Risperdal); 254 (August 29, 2011: Plaintiff was "clear" and cooperative, spoke normally, reported that he found the change in medication to Remeron "helpful," and asked for medication "to control his anxiety"); 335 (October 28, 2011: Dr. Crumpler determined that Remeron and Buspar controlled Plaintiff's depression ); 322-23 (July 26, 2012: Plaintiff reported that the antidepressant Remeron had been effective in controlling the symptoms of his depression and helped him sleep better, but the symptoms returned when he had not taken Remeron in three months.  And on mental status examination, Plaintiff was alert, neatly dressed, calm, and appropriate, had normal speech rate and rhythm, did not appear depressed, had logical and coherent thought processes, had no suicidal or homicidal ideation, had no auditory or visual hallucination, did not exhibit any evidence of delusions or paranoid ideation, and appeared to have normal cognition); 320 (September 6, 2012: Plaintiff was alert, calm, engageable, and neatly dressed, reported sleeping well on Remeron but having a poor appetite, did not experience side effects while on Remeron and Buspar, and denied having suicidal ideation and feelings of hopelessness); 318 (September 26, 2012: Dr. Wilmer reported that Plaintiff's depression was stable); 340 (December 27, 2012: Plaintiff reported to Dr. Boroff that his mood was "down" due to his being out of medication, and that "When on medication, he feels much better"); 361 (Plaintiff reported that the medication Buspar helped him with his problem of biting his nails); 365-66 (April 9, 2013: Plaintiff reported that he had taken the medications Buspar and Remeron and that they were helpful, denied experiencing paranoia and having auditory or visual hallucinations and suicidal or homicidal ideation, and reported that his sleeping and eating were "good"); 373 (September 5, 2013: Plaintiff had no changes in medication, denied having suicidal or homicidal ideation or auditory hallucinations, and reported that medication helped his mood);

35

369 (January 13, 2014: Plaintiff was referred for psychiatric treatment, but did not show up for his appointment). *See also* 20 C.F.R. § 416.930 (a), (b) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work"; "If you do not follow the prescribed treatment without a good reason, we will not find you disabled…"); *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (impairments that can be effectively controlled with treatment are "not disabling" for purposes of determining SSI eligibility).

Again, while Plaintiff may disagree with the ALJ's interpretation of the evidence as being indicative that Plaintiff's condition improved and was stable when Plaintiff was on medication (*see* Pl.'s Mot. at 8), the ALJ's interpretation was rational and supported by substantial evidence, and should therefore be upheld. *See Jamerson v. Chater*, 112 F.3d 1064, 1067 (9th Cir. 1997); *Magallanes*, 881 F.2d at 750. Moreover, it was permissible for the ALJ to give Dr. Wiebe's opinion less weight given that she only examined Plaintiff one time. *See* 20 C.F.R. § 416.927(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations").

As to Dr. Spivey, the Court finds that the ALJ provided specific and legitimate reasons for rejecting his assessment. AR 20. The ALJ found there was no factual support for Dr. Spivey's conclusion that Plaintiff had three repeated episodes of decompensation within a twelve-month period, each of at least two weeks' duration. AR 20. As the ALJ noted, there was no evidence that Plaintiff experienced any decompensation or was hospitalized for psychiatric reasons, and rather, Plaintiff reported to his doctors that he had never received psychiatric treatment or been psychiatrically hospitalized before his treatment started in May 2010. AR 20, 183, 210 (May 19, 2010: Plaintiff reported that he had never received psychiatric treatment or attempted suicide in the past). In addition, the ALJ reasonably found that the objective evidence in the record, as

already described above, did not support Dr. Spivey's assessment.  *See* 20 C.F.R. § 416.927(c)(3), (4); *Thomas*, 278 F.3d at 957.

The ALJ instead gave some weight to the opinion of Dr. Patricia Spivey, finding that her opinion was supported by Plaintiff's cognitive testing and Dr. Spivey's observations of Plaintiff on mental status examination.  AR 20; *see* 20 C.F.R. § 416.927(c)(3), (4); *Tonapetyan*, 242 F.3d at 1149.  Dr. Spivey opined that Plaintiff was capable of performing simple tasks and "maintaining sufficient persistence" to complete such tasks, while being moderately limited in adapting to changes and withstanding the stress of a routine workday.  AR 20, 221.  The ALJ noted that Dr. Spivey's assessment was supported by Plaintiff's cognitive testing, including a full scale IQ score of 79, which is "consistent with his presentation and history."  AR 20, 221.  Dr. Spivey reported that Plaintiff also performed fairly well on the memory subtests, and Bender drawing tests revealed no severe deficits.  AR 20, 219, 221.  Moreover, Dr. Spivey noted that Plaintiff had taken public transportation to the appointment (AR 219) and could shower, dress, and feed himself (AR 220).  On mental status examination, Plaintiff was oriented to person, place, time, and purpose.  AR 220.  Thought process and content included evidence of poor reality testing, but Plaintiff did not respond to internal stimuli or any loose associations; Plaintiff presented a flat affect, had a fair mood, had good attention, and had poor insight and judgment.  *Id*.

The ALJ noted that Dr. Spivey found that Plaintiff had "moderate to marked limitations in maintaining emotional stability and interacting with others," but the ALJ found that the record overall indicated that Plaintiff had greater emotional stability when he complied with his prescribed medication treatment.  AR 20.  Accordingly, the ALJ reasonably believed Plaintiff should be limited to occasional interaction with supervisors and coworkers based on his limitations.  AR 20; *see also* AR 234-35 (November 17, 2010: State agency reviewing physician Dr. Lucila opined that Plaintiff was not significantly limited in most areas of mental functioning, including in the abilities to understand, remember, and carry out very short instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them,

37

1  and respond appropriately to changes in the work setting).

2       Thus, because the ALJ's interpretation of the evidence was rational and supported by

3  substantial evidence, Plaintiff fails to establish anything more than harmless error, and the ALJ's

4  evaluation of the medical opinion evidence must therefore be upheld.

5  **D.     Whether the ALJ Erred in Finding that Plaintiff Did Not Meet a Listed Impairment**

6       As noted above, at the third step, the ALJ must determine whether the claimant has an

7  impairment or combination of impairments that "meets or equals" an impairment listed in 20

8  C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  Plaintiff argues that the

9  ALJ erred in determining that he did not meet or equal Listings 12.03, 12.04, and 12.05.  Pl.'s

10  Mot. at 13.

11       1.     Legal Standard

12       The Listing of Impairments describes impairments that "would prevent an adult, regardless

13  of his age, education, or work experience, from performing *any* gainful activity."  *Sullivan v.*

14  *Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original).  If a claimant's "impairment meets or

15  equals one of the listed impairments, the claimant is conclusively presumed to be disabled."

16  *Bowen*, 482 U.S. at 141; *see also* 20 C.F.R. § 404.1520(d).  The claimant bears the burden of

17  establishing a prima facie case of disability under the Listing of Impairments.  *See Thomas*, 278

18  F.3d at 955; *see also* 20 C.F.R. § 404.1520(a)(4)(iii).

19       An impairment meets a listing when all of the medical criteria required of that listing are

20  satisfied.  20 C.F.R. § 404.1525(c)(3); *Tackett*, 180 F.3d at 1099 ("To meet a listed impairment, a

21  claimant must establish that he or she meets each characteristic of a listed impairment relevant to

22  his or her claim.").  "To equal a listed impairment, a claimant must establish symptoms, signs and

23  laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant

24  listed impairment . . . ."  *Id*. at 1099 (emphasis omitted) (quoting 20 C.F.R. § 404.1526(a)).

25  Medical equivalence should be based on medical findings and a "generalized assertion of

26  functional problems is not enough to establish disability at step three."  *Id*. at 1100.

27

28                                              38

United States District Court
Northern District of California

2.      <u>Application to the Case at Bar</u>

a.      *Listings 12.03 and 12.04*

Listing 12.03 refers to "schizophrenic, paranoid and other psychotic disorders" and is "[c]haracterized by the onset of psychotic features with deterioration from a previous level of functioning."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.03.  Listing 12.04 refers to "affective disorders" and is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation."  *Id*. § 12.04.  In order to meet both listings, a claimant must satisfy the requirements in Paragraphs A and B, or the requirements of Paragraph C of the listings.  *Id*.

For Listing 12.03, Paragraph A requires that a claimant demonstrate medically documented persistence, either continuous or intermittent, of one of more of the following: (1) delusions or hallucinations, (2) catatonic or other grossly disorganized behavior, (3) incoherence, loosening of associations, illogical thinking, or poverty of content of speech if associated with blunt, flat, or inappropriate affect, or (4) emotional withdrawal and/or isolation.  *Id*. § 12.03.  For Listing 12.04, Paragraph A requires that a claimant demonstrate a certain number of factors characterizing depressive, manic, or bipolar syndromes.  *Id*. § 12.04.

For both listings, Paragraph B requires that the syndromes in Paragraph A result in at least two of the following: (1) marked restrictions of activities of daily living, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration.  *Id*. §§ 12.03-04.

Paragraph C requires that a claimant show a medically documented history of "a chronic schizophrenic, paranoid, or other psychotic disorder" for Listing 12.03, or a "chronic affective disorder" for Listing 12.04, "of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and one of the following:

1. Repeated episodes of decompensation, each of extended duration;

United States District Court
Northern District of California

or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.*

Plaintiff argues that he meets the requirements for Listing 12.03 because his medical providers documented symptoms that meet the criteria of Paragraph A.  Pl.'s Mot. at 13. Specifically, he notes that treating and examining doctors found that his affect is inappropriate and flat (AR 183, 220, 256, , 276, 347, 348), he emotionally withdraws and isolates himself (AR 276, 284, 340, 348, 354), and he suffers from (auditory) hallucinations (AR 183, 186, 290, 343, 348, 353) and paranoia (AR 186, 221, 275, 348, 354).  Plaintiff argues that he meets the requirements for Listing 12.04 because Drs. Wiebe, Boroff, and William Spivey, as well as doctors at Santa Rita and Lifelong, diagnosed him with an affective disorder.  Pl.'s Mot. at 13 (citing AR 183, 256, 276, 283, 320, 323, 338-40, 342, 344, 346-47, 354, 359, 361, 363-67, 375).  He also notes that his providers documented the persistence of at least seven of the symptoms in Paragraph A.  *Id.* at 14 (citing AR 175, 183, 270, 284, 290, 322-23, 345, 347-48, 353-54).

The ALJ found that Plaintiff had "no more than mild restriction in activities of daily living," "no more than moderate difficulties in social functioning," and "no more than moderate difficulties in maintaining concentration, persistence, or pace."  AR 17-18.  As to his activities of daily living, she noted that Plaintiff is able to perform household chores such as doing the dishes and vacuuming, his doctors consistently reported that he is appropriately groomed, he himself reported that he cares for birds as a hobby, and he stated that he can pay bills and otherwise handle his finances.  AR 17.  As to his social functioning, the ALJ noted that Plaintiff reported taking public transportation generally, he reported that he did not have problems getting along with authority figures, and his treatment providers consistently thought he was cooperative during examinations.  *Id.*  As to maintaining concentration, persistence, or pace, the ALJ noted that Dr.

40

Patricia Spivey found that Plaintiff paid good attention during his consultative examination, his WAIS-IV results were not congruent with the alleged severity of his memory and concentration problems, and his high school transcript showed multiple A and B grades.  AR 18.  The ALJ also found that the record contains no evidence of Plaintiff having episodes of decompensation lasting two weeks or more each.  *Id.*

Having reviewed the ALJ's reasoning and the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence.  The record supports the ALJ's finding that Plaintiff had only mild limitations in activities of daily living.  As the ALJ noted, Plaintiff reported that he was able to do some household chores, such as vacuuming and doing dishes.  AR 17, 291-92.  While Plaintiff stated he had trouble getting dressed, his doctors consistently reported that he was appropriately groomed or well-groomed and neatly dressed.  AR 17, 178, 203, 268, 291-92, 320, 359; *see also* AR 220 (Plaintiff reported that he could shower and dress himself).  Plaintiff also cared for and fed birds as a hobby.  AR 17, 292.  Plaintiff stated that he could pay his bills and handle his finances (AR 17, 133), though Dr. Patricia Spivey found he needed some help "handling funds" (AR 221).  The record also reflects that Plaintiff takes public transportation.  AR 17, 219-20.  Further, although Plaintiff stated that he did not like to go out or be around people, he still made himself go to his appointments.  AR 19, 130.  While Plaintiff may have a different interpretation of this evidence, where the ALJ's interpretation of the evidence is rational, as it is here, the ALJ's decision must be upheld.  *Magallanes*, 881 F.2d at 750.

The record also supports the ALJ's finding that Plaintiff was only moderately restricted in social functioning.  The evidence establishes that Plaintiff was able to take public transportation to get to his appointments (AR 17, 19, 130, 219-20), he was consistently cooperative or "very" cooperative, even calm at times, at his examinations (AR 17, 178, 200, 203, 254-57, 268, 292, 343, 346, 354, 359, 361), and he reported that he did not have problems with authority figures (AR 17, 136).  As to Plaintiff's alleged difficulties in maintaining concentration, persistence, and pace, the ALJ noted Plaintiff's statement that he could pay attention for only five to ten minutes, but also took note of Dr. Patricia Spivey's opinion that Plaintiff paid "good" attention, that he

41

1    performed fairly well on memory subtests, and that the Bender drawing tests revealed no severe

2    deficits.  AR 18, 219-21.  The ALJ also noted that Plaintiff maintained enough concentration in

3    school to receive As and Bs in some of his classes, which belied a "marked" restriction in

4    concentration, persistence, or pace.  AR 18, 171.

5           Although Plaintiff may disagree with these findings, he has failed to show that the ALJ's

6    interpretation of the evidence was not reasonable.  *See Tommasetti*, 533 F.3d at 1041-42.

7    Moreover, even if the Court were to find that the evidence is susceptible to more than one rational

8    interpretation, the ALJ's findings, if rational, must be upheld.  *Andrews v. Shalala*, 53 F.3d 1035,

9    1039-40 (9th Cir. 1995).  The key question "is not whether there is substantial evidence that could

10   support a finding of disability, but whether there is substantial evidence to support the

11   Commissioner's actual finding that claimant is not disabled."  *Jamerson*, 112 F.3d at 1067.

12   Finally, to the extent the ALJ did not specifically address Listing 12.03, Plaintiff has failed to meet

13   his burden to show that this error is harmful, as the record supports the ALJ's finding that Plaintiff

14   has no more than a mild restriction of activities of daily living and has no more than moderate

15   difficulties in social functioning.  Thus, the harmless error rule applies.  *Curry*, 925 F.2d at 1131;

16   *Molina*, 674 F.3d at 1111.  Accordingly, because the ALJ's decision is supported by substantial

17   evidence and is free of legal error, it must be upheld.  *Lockwood v. Comm'r Soc. Sec.*, 616 F.3d

18   1068, 1071 (9th Cir. 2010) ("We must uphold an ALJ's decision so long as it is supported by

19   substantial evidence and is not based on legal error").

20                      b.      Listing 12.05

21          Listing 12.05 refers to "intellectual disability" and defines it as "significantly subaverage

22   general intellectual functioning with deficits in adaptive functioning initially manifested during the

23   developmental period; i.e., the evidence demonstrates or supports onset of the impairment before

24   age 22."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.  Plaintiff maintains that he meets the

25   requirements for Listings 12.05C and D.  Pl.'s Mot. at 13.  Listing 12.05C requires "[a] valid

26   verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment

27   imposing an additional and significant work-related limitation of function."  20 C.F.R. § Pt. 404,

28                                                      42

United States District Court
Northern District of California

Subpt. P, App. 1 § 12.05C.  Listing 12.05D requires "[a] valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: 1. Marked restriction of activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence, or pace; or 4. Repeated episodes of decompensation, each of extended duration." *Id*. § 12.05D.

Plaintiff argues that the record establishes that he meets these requirements because his verbal IQ is 70 and he did poorly in school and was in special education for slow learners.  Pl.'s Mot. at 13 (citing AR 171-72, 219-20, 266-67, 322, 353).  He also notes that he has been diagnosed with Learning Disorder NOS and Borderline Intellectual Functioning, and that his depression and psychosis impose additional and significant work-related limitations of function. *Id*. (citing AR 276, 323).

While the record does reflect that Plaintiff had a verbal IQ score of 70 (AR 220), it does not reflect that he had "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period," as is required under Listing 12.05.  While Plaintiff alleged that he was a "slow" learner and was in special education growing up, the ALJ reasonably found these representations inconsistent with the record evidence of Plaintiff's high school transcript, which indicated that while he failed some classes, he also received As and Bs in others.  AR 18, 171.  Moreover, other than his own statements, there is no evidence in the record of Plaintiff's enrollment in special education classes.  AR 171-72.  Rather, his high school transcript demonstrates that Plaintiff was enrolled in college preparatory classes, including World Culture, Algebra, U.S. History, English, and Economics.  AR 171.  Such inconsistencies support the ALJ's decision.  *See Gomez v. Colvin*, 2016 WL 463247, at *11 (N.D. Cal. Feb. 8, 2016) (finding no legal error in the ALJ's determination that the plaintiff did not meet the requirements of Listing 12.05, in part based on plaintiff's academic record); *Mallough v. Astrue*, 2009 WL 982795, at *14 (W.D. Pa. Apr. 9, 2009) (concluding that the "ALJ did not err by finding that the results of [the doctor]'s test did not accurately reflect [the claimant]'s intellectual abilities," and, thus, the claimant "did not satisfy Listing 12.05C," as the claimant's high school

United States District Court
Northern District of California

1   grades and the levels of function in his activities of daily living were inconsistent with a doctor's

2   diagnosis of mild mental retardation, and were therefore legitimate record evidence to consider in

3   deeming the doctor's IQ test invalid).

4        Once again, although Plaintiff may disagree with the ALJ's findings, he has failed to show

5   that the ALJ's interpretation of the evidence was not reasonable. *Tommasetti*, 533 F.3d at 1041-

6   42. Further, to the extent the ALJ did not specifically address Listing 12.05, Plaintiff has failed to

7   meet his burden to show that this error is harmful, as the record does not reflect that Plaintiff had

8   significantly subaverage general intellectual functioning with deficits in adaptive functioning

9   initially manifested during the developmental period. Thus, the harmless error rule applies.

10   *Curry*, 925 F.2d at 1131; *Molina*, 674 F.3d at 1111. Since the ALJ's findings are rational and

11   supported by substantial evidence, they must be upheld. *Andrews*, 53 F.3d at 1039-40; *Lockwood*,

12   616 F.3d at 1071.

13   **E.**    **Whether the ALJ Properly Assessed Plaintiff's RFC**

14        Before proceeding to step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §

15   404.1520(e). The ALJ determined that Plaintiff has the RFC to perform light work "except that he

16   is limited to simple, routine work with no more than occasional contact with co-workers or

17   supervisors, and no contact with the public." AR 18. Plaintiff argues that this determination is not

18   based on substantial evidence because the ALJ primarily relied on her own interpretation of the

19   medical records and the consultative examining doctors' opinions. Pl.'s Mot. at 18.

20        RFC is the most a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a). It

21   is assessed by considering all the relevant evidence in a claimant's case record. *Id.*; *see also*

22   *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When a case is before an ALJ, it is the ALJ's

23   responsibility to assess a claimant's RFC. 20 C.F.R. § 404.1546(c); *see also Vertigan v. Halter*,

24   260 F.3d 1044, 1049 (9th Cir. 2001) ("It is clear that it is the responsibility of the ALJ, not the

25   claimant's physician, to determine residual functional capacity."). "Generally, the more consistent

26   an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20

27   C.F.R. § 416.927(c)(4).

28                             44

United States District Court
Northern District of California

1    The Court finds that substantial evidence supports the ALJ's RFC assessment that Plaintiff

2    could perform light work as defined under 20 C.F.R. § 416.967(b).  As the ALJ noted, in March

3    2012, Dr. Brimmer evaluated Plaintiff and reported that, although he came with a cane and walked

4    with a limp, Plaintiff had no difficulty moving about the exam room, getting onto the exam table,

5    manipulating his clothing and personal items, and opening the door.  AR 17, 21, 292-93.  On

6    physical examination, Plaintiff had full 5/5 strength in his lower extremities, had no evidence of

7    muscle atrophy, was able to stand on his tiptoes and heels, and could walk heel-to-toe in a straight

8    line.  AR 17, 21, 294.  Dr. Brimmer opined that Plaintiff could stand or walk for six hours in an

9    eight-hour workday, sit without limitation, walk with a cane, lift up to 50 pounds occasionally and

10   25 pounds frequently, occasionally climb, balance, stoop, kneel, crouch, and crawl, perform

11   manipulative activities without limitation, and perform workplace environmental activities without

12   limitation.  AR 21, 294-95; *see also* AR 21, 267 (Dr. Wiebe reported that Plaintiff came to the

13   examination without a cane).

14   Plaintiff argues that the ALJ committed error because she gave weight to Dr. Brimmer's

15   conclusions yet failed to give weight to Dr. Brimmer's finding that Plaintiff requires a cane.  Pl.'s

16   Mot. at 18 (citing AR 294).  However, the fact that Dr. Brimmer found that Plaintiff should use a

17   cane does not invalidate the rest of Dr. Brimmer's opinion that Plaintiff could still perform

18   medium work, stand and walk for six hours in an eight-hour workday, sit without limitation, and

19   perform manipulative activities.  AR 294-95.  The ALJ explicitly noted that while Dr. Brimmer's

20   RFC assessment was supported by treatment records, Dr. Brimmer's recommendation for use of a

21   cane for ambulating long distances was not consistent with the weight of evidence demonstrating

22   that the use of a cane was not medically necessary.  AR 21; *see* 20 C.F.R. § 416.927(c)(4)

23   ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will

24   give to that opinion."); *Tonapetyan*, 242 F.3d at 1149.  Regardless, the ALJ actually assessed a

25   more restrictive exertional RFC than Dr. Brimmer and the State agency doctors, who found a

26   medium RFC, and the ALJ instead gave Plaintiff's condition, including having an antalgic gait

27   and some decreased flexion in the right knee, the benefit of the doubt and assessed that he could

28

United States District Court
Northern District of California

45

perform light work rather than medium work.  AR 21, 295 (Dr. Brimmer), 301-02 (Dr. Pancho).

As to Plaintiff's mental impairments, as discussed above, substantial evidence supports the ALJ's finding – largely based on Dr. Patricia Spivey's report of the tasks Plaintiff could perform (AR 20, 221) – that mentally, Plaintiff could perform at least simple, routine work, with only occasional contact with supervisors and coworkers, and no contact with the public.  Plaintiff argues that the ALJ failed to give weight to Dr. Spivey's conclusions that Plaintiff has moderate limitations in adapting to changes and withstanding the stress of a routine workday and moderate to marked limitations in maintaining emotional stability/predictability and interacting appropriately with co-workers, supervisors, and the public on a daily basis.  Pl.'s Mot. at 18 (citing AR 20, 221).  However, the ALJ's limitation to simple routine work adequately addressed Plaintiff's moderate limitations in adapting to changes and withstanding everyday stress.  AR 20; *see, e.g.*, AR 354 (Dr. Boroff reported that on examination, Plaintiff was oriented times four, as well as cooperative and engaged, and that his mood was depressed but his affect was not mood-congruent); 359 (February 5, 2013: Plaintiff was alert, spoke clearly, had "good" grooming, made good eye contact, and was cooperative); 180, 206 (June 15, 2010: Plaintiff was well groomed, anxious, made good eye contact, was clear and coherent, and found medications helpful); 178, 203 (July 14, 2010: Plaintiff was cooperative, was well-groomed, had good eye contact, was talkative, had clear and coherent speech, was "doing well" on psychiatric medication, and had a "good" mood); 257 (July 21, 2011: Plaintiff was cooperative and pleasant); 254 (August 29, 2011: Plaintiff was "clear" and cooperative, made no abnormal movements, and his speech was within normal limits); 268 (November 7, 2011: Plaintiff was well-groomed and casually dressed, had an anhedonic and mildly dysphoric mood, was generally dissociated, had a normal affect, was cooperative during the interview, had normally flowing thoughts, appeared to have "slowed" thinking with delayed responses, spoke vaguely, expressed suicidal ideation without intent, and was oriented to person, place, and time); 323 (July 26, 2012: Plaintiff was alert, neatly dressed, calm, and appropriate; had normal speech rate and rhythm; had depressed mood; had a positive affect within the normal range; did not appear depressed; had logical and coherent thought

46

1   processes; had no suicidal or homicidal ideation; and appeared to have normal cognition); 346

2   (Plaintiff was casually dressed, made poor eye contact, was "very cooperative," had slow and soft

3   speech, described his mood as depressed and his affect as sad, had a linear and logical thought

4   process, was fully alert and oriented, and had fair insight and poor judgment); 361 (February 19,

5   2013: Plaintiff was alert, oriented, and cooperative; made fairly good eye contact; spoke clearly;

6   had an anxious and depressed mood; had a somewhat dysthymic affect; had no suicidal or

7   homicidal ideation; and had linear thought processes); 365-66 (Plaintiff was somewhat guarded,

8   spoke clearly and mostly coherently, described his own mood as "fine," and had a guarded and

9   slightly hypomanic affect).

10          Further, the ALJ reasonably found that the record "demonstrates that the Plaintiff has

11   much greater emotional stability when he is compliant with medication" than what Dr. Spivey

12   opined regarding this area of mental functioning.  AR 20; *see, e.g.*, AR 178 (July 14, 2010:

13   Plaintiff was "doing well" on psychiatric medication and was in a "good" mood); AR 202

14   (September 10, 2010: Plaintiff "seems [to be in a] fairly good mood" and "feels he does well just

15   w[ith] Paxil and [his] mood is controlled"); 199-200 (October 6, 2010: Plaintiff had a normal

16   appearance, was calm and cooperative, did not show signs of distress, and denied having suicidal

17   and homicidal ideation, intent, or plan.  Plaintiff reported that he was "doing well on his current

18   med[ications]" without experiencing side effects, was calm, appropriate, and in a good mood, and

19   agreed to continue taking his medication); AR 254 (August 29, 2011: Plaintiff was "clear" and

20   cooperative, and found changing his medication to Remeron "helpful"); AR 322-23 (July 26,

21   2012: Plaintiff reported that taking the antidepressant medication Remeron had been effective in

22   controlling his depressive symptoms, but that the symptoms returned when he stopped taking

23   Remeron for three months); AR 345 (August 30, 2012: Plaintiff reported that he was currently

24   taking Risperdal to "make the voices go away," but while they still occur at times, his last auditory

25   hallucination was a year prior); AR 340 (December 27, 2012: Plaintiff reported that his mood was

26   "down" due to his being out of medication, and that "When [he is] on medication, he feels much

27   better."); AR 359 (February 5, 2013: Plaintiff stated that medication was "helpful," denied having

United States District Court
Northern District of California

28                                                  47

any suicidal ideation, and was alert, spoke clearly, made good eye contact, and was cooperative); 365 (April 9, 2013: Plaintiff reported taking the medications Buspar and Remeron and said that these medications helped him); 373 (September 5, 2013: Plaintiff reported that medication helped his mood, and he denied having any suicidal or homicidal ideation or auditory hallucinations). "Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits." *Warre*, 439 F.3d at 1006; *Sample v. Schweiker*, 694 F.2d 639, 642-44 (9th Cir. 1982) (mental impairments that are "amenable to control" are not disabling).

Finally, Plaintiff argues that the ALJ improperly rejected the more restrictive opinions of other psychiatrists and psychologists in favor of her own. Pl.'s Mot. at 18-19. However, the record reflects that the ALJ thoroughly reviewed all the evidence and, as discussed above, substantial evidence supports her evaluation of the medical opinion evidence. It is the ALJ's duty, not that of a doctor, to determine RFC. *See Vertigan*, 260 F.3d at 1049 (citing 20 C.F.R. § 404.1546(c)). Plaintiff fails to point to any opinion or other evidence that makes the ALJ's decision unreasonable. Accordingly, the ALJ's RFC determination must be upheld.

**F.     Whether the ALJ Properly Evaluated Plaintiff's Credibility**

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." AR 19. However, she found that his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id*. Plaintiff argues that the ALJ did not properly evaluate his credibility because she failed to provide specific reasons for finding that his statements are not credible. Pl.'s Mot. at 20.

    1.     Legal Standard

Congress expressly prohibits granting disability benefits based on a claimant's subjective complaints. *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability"); 20 C.F.R. § 416.929(a) (an ALJ will consider all of a claimant's statements about symptoms, including pain, but statements about

pain or other symptoms "will not alone establish" the claimant's disability). "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to [the Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). An ALJ is, however, required to make specific credibility findings. *See* SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996) (the credibility finding "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight").

A two-step analysis is used when determining whether a claimant's testimony regarding their subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). First, it must be determined "whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)). A claimant does not need to "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Smolen*, 80 F.3d at 1282).

Second, if the claimant has met the first step and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id*. (quoting *Smolen*, 80 F.3d at 1281). "The ALJ must state specifically which . . . testimony is not credible and what facts in the record lead to that conclusion." *Smolen*, 80 F.3d at 1284. Where the ALJ "has made specific findings justifying a decision to disbelieve an allegation of excess pain, and those findings are supported by substantial evidence in the record," courts must not engage in second-guessing. *Fair*, 885 F.2d at 604. However, "a finding that the claimant lacks credibility cannot be premised wholly on a lack of medical support for the severity of his pain." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997) (citing *Lester*, 81 F.3d at 834; *Cotton v. Bowen*, 799 F.2d 1403, 1407 (9th Cir. 1986) ("'Excess pain' is, by definition, pain that is unsupported by objective medical findings.").

Factors that an ALJ may consider in weighing a claimant's credibility include:

1   "[claimant's] reputation for truthfulness, inconsistencies either in [claimant's] testimony or

2   between [his] testimony and [his] conduct, [claimant's] daily activities, [his] work record, and

3   testimony from physicians and third parties concerning the nature, severity, and effect of the

4   symptoms of which [claimant] complains." *Thomas*, 278 F.3d at 958-59 (quoting *Light*, 119 F.3d

5   at 792).

6           2.          Application to the Case at Bar

7           The ALJ's decision provides specific facts from the record that support her credibility

8   determination.  First, the ALJ noted that Plaintiff received routine, conservative medication

9   treatment for his symptoms, and this treatment effectively stabilized his condition, so he did not

10  need to be hospitalized for psychiatric treatment.  AR 19-20; *see, e.g.*, AR 183, 210, 322, 323 (no

11  hospitalizations or psychiatric treatment prior to entering Santa Rita Jail); 178, 180, 200, 202-03,

12  206, 254, 257, 268, 346, , 359, 365-66 (Plaintiff doing well on medication, including not having

13  auditory hallucination)).  An ALJ permissibly discounts a claimant's allegations of disabling pain

14  where he did not receive anything more than minimal conservative treatment and had never been

15  hospitalized for his symptoms.  *Fair*, 885 F.2d at 604; *Warre*, 439 F.3d at 1006.

16          Second, the ALJ found Plaintiff's claim of disability less reliable based on evidence of his

17  non-compliance with medication treatment.  AR 19, 184, 212 (Plaintiff refused antidepressant

18  medication); 196, 260 (Dr. Rosenthal reported that Plaintiff was not compliant with medication

19  treatment); 366 (Dr. Sachdev reported that Plaintiff refused anti-psychotic medication).  In

20  evaluating credibility, an ALJ may consider the failure to seek treatment or to follow a prescribed

21  course of treatment.  *Tommasetti*, 533 F.3d at 1039; *Fair*, 885 F.2d at 604; *see also* 20 C.F.R. §

22  416.930 (a), (b) ("In order to get benefits, you must follow treatment prescribed by your physician

23  if this treatment can restore your ability to work"; "If you do not follow the prescribed treatment

24  without a good reason, we will not find you disabled").

25          Third, the ALJ found a lack of objective evidence in support of the symptoms Plaintiff

26  alleged.  AR 17-21.  Although lack of medical evidence cannot form the sole basis for discounting

27  symptom testimony, "it is a factor that the ALJ can consider in [her] credibility analysis."  *Burch*,

United States District Court
Northern District of California

400 F.3d at 681; *see also Morgan*, 169 F.3d at 599-600 (the ALJ may consider inconsistencies between medical evidence and the claimant's testimony of disabling restrictions).  As the ALJ noted, examining psychologist Dr. Thomas observed Plaintiff "to have a normal mental status examination," and said that Plaintiff was calm, did not appear depressed, spoke normally, and had logical and coherent thought processes and no auditory hallucinations.  AR 19, 323.  In addition, the ALJ noted that Plaintiff's progress notes in general indicated that he was doing well when on medication.  AR 19-20; *see, e.g.*, AR 359, 365-66).  While Plaintiff alleged that he was further restricted physically, including that he had to walk with a cane, his physical examinations indicated full motor strength and no muscle atrophy or problems moving about or getting on an exam table, and were otherwise normal physical examinations.  AR 21, 292-94.

   Fourth, the ALJ properly rejected Plaintiff's claims of having marked restrictions in the areas of activities of daily living, social functioning, and maintaining concentration, persistence, or pace, and having episodes of decompensation based on Plaintiff's own admitted activities and capabilities, belying an inability to perform at least simple repetitive work with occasional contact with supervisors and coworkers.  AR 17-18; *see Tommasetti*, 533 F.3d at 1039 (the ALJ may consider daily activities and "ordinary techniques of credibility evaluation," including inconsistencies in Plaintiff's statements and between Plaintiff's statements and the record); *Thomas*, 278 F.3d at 958-59; *Molina*, 674 F.3d at 1112-13 ("Even where [the claimant's] activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment") (citing *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1225 (9th Cir. 2010)); *Valentine*, 574 F.3d at 693). As the ALJ noted, Plaintiff was able to perform chores such as vacuuming and doing dishes, went to appointments, had problems getting dressed but was able to dress well enough to be reported as well-groomed for appointments, could handle his own finances, took public transportation, and even engaged in the hobby of feeding birds.  AR 17, 133, 219-20, 291-92.  Accordingly, the Court finds that the ALJ's decision is supported by substantial evidence and free of legal error. Therefore, the ALJ did not commit reversible error.

United States District Court
Northern District of California

## CONCLUSION

For the reasons stated above, the Court hereby **DENIES** Plaintiff's Motion for Summary Judgment and **GRANTS** Defendant's Cross-Motion for Summary Judgment.  Judgment shall be entered accordingly.

**IT IS SO ORDERED.**


Dated: June 27, 2016

_____

MARIA-ELENA JAMES
United States Magistrate Judge

United States District Court
Northern District of California

52